374 So.2d 377 (1978)
R. A. THOMPSON, alias
v.
STATE.
7 Div. 550.
Court of Criminal Appeals of Alabama.
October 3, 1978.
Rehearing Denied October 31, 1978.
*378 Jack W. Torbert and Howard B. Warren of Simmons & Torbert, Gadsden, for appellant.
William J. Baxley, Atty. Gen., and John A. Yung, IV, Asst. Atty. Gen., for the State, appellee.
DeCARLO, Judge.
The appellant, R. A. Thompson, alias Bob Thompson, was jointly indicted with Fred Orgovan on August 22, 1975, by the Etowah County Grand Jury for the second degree burglary of the City Board of Education Building in Gadsden, Alabama.
A motion for severance was granted. After a motion for a change of venue and a motion to dismiss or quash the indictment were denied, the appellant was arraigned on May 17, 1976.
The trial was begun on May 24, 1976, but due to the hospitalization of a juror, it resulted in a mistrial.
On March 24, 1977, the appellant was again placed on trial and was found guilty. He was sentenced to five years imprisonment. A motion for a new trial was filed and after it was denied notice of appeal was given.
The evidence at trial showed that in March, 1973, the Board of Education of Gadsden entered into a cost-plus contract with Thompson Construction Company to rebuild Gadsden High School. The school previously had been seriously damaged by fire. The appellant, R. A. Thompson, was vice president of the construction company and personally signed the contract on behalf of Thompson Construction Company.
In September and October of 1973, with the school approximately three-fourths completed, billings submitted by Thompson Construction Company for work done were questioned as having over-charges for certain items. An audit for the billing records *379 was made in either September, 1973, or early January of 1974, and the Board of Education asked the attorney general's office to investigate the matter.
In the latter part of January, 1974, Ricky Ray Cochran entered the education building in Gadsden and stole all the files pertaining to the rebuilding of the high school by Thompson Construction Company. Just prior to entering the education building, on the same evening, he and another person, named Orgovan, also entered the office of Thompson Construction Company and stole some calculators, money, whiskey, and the files on the Gadsden High School project related to money, billings and payment. No other files were taken.
According to Cochran, the defendant, Thompson, had a conversation with him in Fred Orgovan's house concerning stealing the records from the education building. Cochran stated that Thompson also wanted the Thompson Construction Company's office broken into and ransacked. The payment for each job was to be $250.
Cochran testified that two or three days later he and Orgovan had another conversation with Thompson and, at that time, the defendant asked whether he (Cochran) would rather break in, or have some keys provided. Cochran told Thompson that he would rather have some keys and Thompson said he would do what he could.
Two days later, Thompson came to the auto parts place where Cochran worked, and in the presence of Orgovan, gave Cochran keys. Thompson said that the keys were for the Board of Education Building and told them to file the word, "Eagle", off the keys in case the keys were lost. Cochran stated that he and Orgovan filed the word, "Eagle" off the keys. A day or two later they went to Thompson's office where the appellant drew a diagram of the education building. In the diagram, he marked the doors that the keys would fit and the conference room where the records were kept.
According to Cochran, Thompson showed him and Orgovan the items at the construction company that were to be taken, including money from the drink box, petty cash, and several calculators. Cochran said that the appellant also told them at the time to ransack the desk and throw papers on the floor. He also indicated one calculator that they were not to take.
A day or two later, Thompson came by the auto parts place, picked up Cochran and Orgovan, and drove them to the board of education building. Thompson showed them the building and indicated the front door that one of the keys would fit. Two days later, Cochran and Orgovan met the appellant again and told him that they had decided to do the "two jobs" Saturday night. Cochran stated that the Saturday was sometime in January, 1974, but he did not remember the specific date. Cochran did say that on Saturday night Orgovan came by his house around 9:30 and picked him up. Cochran testified that he carried a flashlight, gloves, and two pillowcases with him when he left the house. Cochran said that the pillowcases were to be used for the records.
According to Cochran, they drove first to Thompson Construction Company in a panel truck and, after entering the back door which Thompson had left unlocked as he promised them, he and Orgovan collected the calculators, broke open the drink box, cleaned out the petty cash drawer, and threw papers from the desk on the floor. Cochran said, in addition to the items Thompson told them to take, they also took a knife, cigarette lighter, a bottle of Seagram's whiskey, and a bottle of Wild Turkey whiskey that they found in the office. Cochran testified the Orgovan took the Wild Turkey and he (Cochran) took the Seagram's whiskey.
All these items were taken back to the auto parts place and placed in the trunk of a junked, black Oldsmobile. According to Cochran, while Orgovan was placing the loot in the trunk of the junked car, he returned to Thompson's Construction Company and broke a window to make it look as if someone had broken into the building.
*380 Cochran stated that he and Orgovan then drove to the board of education building and he (Cochran) got out and entered the building with the keys that Thompson had provided. Cochran testified that he went to the back of the building, opened the conference room door with the other key provided by the appellant, and found the records where the appellant had said they would be.
Cochran recalled that the records were placed in the pillowcases and he left the conference room, leaving the door unlocked. Cochran said he left the building through the front door and locked it behind him. Afterwards, he and Orgovan went back to the auto parts place where the pillowcases, containing the records, were placed in the trunk of another junked car.
According to Cochran, the next morning the appellant drove up to the auto parts place and stopped near the junked auto where the stolen records were deposited. At that time, the records were turned over to Thompson and the appellant paid him the remaining three hundred dollars with two, one-hundred-dollar bills, and the rest in twenty-dollar bills.
Cochran testified that he gave his wife, Clara, the two, one-hundred-dollar bills and some "twenties" and said that one of the calculators taken from Thompson Construction Company had gone to Wesley Kilgore.
During cross-examination, Cochran stated that he had been working part-time for Fred Orgovan at the auto parts place for three or four years. According to Cochran, it was at Orgovan's house, behind the auto parts place, that he first met the appellant, Thompson.
James C. Leftwich was the director of maintenance and purchasing for the City of Gadsden Board of Education in January, 1974. Leftwich stated that the last week of January, 1974, he discovered that records relating to the Gadsden High School rebuilding project were missing from the education building. He testified that these records had been kept in the board room at the rear of the building and that during the investigation, the door to the board room was found open. It was at that time that they discovered the records missing.
According to Leftwich, no other items were taken and other items of value, including typewriters, adding machines, and vending machines, were located in the same building.
Further Leftwich said there were perhaps ten or twelve people who had keys to the front door of the education building, and some four persons had keys to the conference room. He stated that he had one of the keys to the conference room and it was kept in the top, left drawer of his desk. He testified that during the first part of the week of January, 1974, he found his key ring, containing the key to the board room, in the center drawer of his desk. He did not recall placing it there.
Leftwich said he found a scrap of an invoice from Head Construction Company to Thompson Construction Company on the table where the missing records had been stacked. According to Leftwich, two-thirds of the torn document was lying on the table where the records had been and he said that he had made a xerox copy of it before turning the original over to the police. During the trial he produced the xeroxed copy of the torn scrap of the invoice and it was marked for identification.
Benny Fred Connell was a sergeant of detectives for the Gadsden City Police Department. He testified that during the last week of January, 1974, he received a call saying there had been a burglary at the Thompson Construction Company. Connell stated that on his arrival he noticed a back window had been broken out and the building had been ransacked.
According to Connell, R. A. Thompson, the appellant, was there at the time and Thompson gave him a partial list of missing items. Among those items were: $17.00 petty cash, $5.00 from the Coca Cola machine, a check book and an Olivetti calculator. Connell said he was later given information that four other calculators, along with a hunting knife, were also missing.
Connell stated the appellant informed him, at that time, of the possibility that the *381 records of the Gadsden High School project might be missing. Connell said the appellant later confirmed that the records were missing. Connell recalled that there was a desk inside the building, underneath the window that had been broken. The drawers of the desk were open and inside they found broken glass.
During cross-examination, Connell testified that, the same week he had gone to the Thompson Construction Company, he went to the Gadsden Board of Education and was told by a man that there was a key missing. Connell said this was January 31, 1974. Further, he said Ricky Ray Cochran's general reputation in the community was bad and he would not believe him under oath.
On further direct examination, Connell testified that he investigated the missing records report at the Board of Education Building on Thursday, the same week that he investigated the report of the burglary at Thompson Construction Company. According to Connell, all of the records of the Gadsden High School Construction job were missing. Nothing else was reported missing and the doors and windows of the building did not show any signs of forced entry.
In January, 1974, Thomas E. McBrayer owned and operated the Eagle Locksmith Key Service in Gadsden, Alabama. Since that date, he has retired, but did remember the appellant having two duplicate keys made and charging them. McBrayer stated that Thompson had purchased keys from him on five other occasions during the years of 1973 and 1974.
Jack Floyd was a member of the City Board of Education and he identified the contract the Board had signed with Thompson Construction Company for the rebuilding of the Gadsden High School. Floyd testified the contract was signed on behalf of the Thompson Construction Company by the defendant, R. A. Thompson, also known as Bob Thompson.
According to Floyd, he had gone to the site of the reconstruction project on a number of occasions. He stated he had examined the billings of the invoices from the Thompson Construction Company that were sent to the Board of Education and that these were the same billings later found to be missing.
Floyd testified that on one of the billings in the records he noticed that the Board of Education had paid Thompson three hundred and fifty dollars in rental for an ordinary office chair. Also that Thompson had billed the Board for a total of three hundred and eighty dollars. At that time, the reconstruction job was no more than three-fourths completed. Further, he said the chair was rented by Thompson to the Board for the use in the reconstruction project. Floyd said that he found Thompson had billed the Board for, and the Board had paid, $11,190, rental for a Ford truck in connection with the reconstruction project. According to Floyd, he had gone to the site of the reconstruction project many times and had never seen the Ford truck in use.
Floyd also testified that the records he examined showed the Board had paid Thompson $10,920. rent for an International truck and $11,040. for the rental of a Chevrolet truck. All of these records were later stolen. Floyd also stated he had examined other billings and found similar instances.
During cross-examination, Floyd testified that the Board approved the payment of all bills prior to their payment and stated that the Board had paid all bills up until December, 1973, at which time they noticed the excessive billings. He stated at that time they requested an audit of the records be done and later at a meeting of the Board he made a motion for a State Attorney General's investigation.
Joseph Benton Cramer testified he knew both the defendant, R. A. Thompson, and the co-indictee, Fred Orgovan. Cramer said he had worked for Orgovan at Fred and Mark's Auto Parts from December, 1973 until July 4, 1974. He stated that he was working for Orgovan at the time Thompson said his construction company office had been burglarized.
Cramer recalled that he overheard a conversation between Thompson and Orgovan in the auto parts place. According to *382 Cramer, he heard Orgovan say to the defendant: "Well, you can't claim that Wild Turkeyor Old Turkeyon your insurance, and I'll sure enjoy drinking it."
Cramer testified that the defendant asked Orgovan: Where did you find that? "Orgovan answered: "Under your desk under the counter."
Ruby Clara Cochran was the wife of Ricky Ray Cochran in January, 1974, but at the time of the trial she had divorced him. She testified that she had learned of the burglaries of the construction company and the Board of Education Building on the radio and in newspaper reports. She recalled that Orgovan drove up in front of their house where she lived with Ricky Cochran, and blew the horn of his car, and that her husband, went out, got into the car, and they left. According to Mrs. Cochran, Ricky took two pillowcases with him on that occasion. She recalled that, when they returned to the house later that night, Ricky had a tall, brown bottle of liquor and a cigarette lighter with "Thompson Construction Co." printed on it.
Mrs. Cochran also recalled that a few days later, Ricky gave her two one-hundred-dollar bills, and some twenty-dollar bills.
During cross-examination, Mrs. Cochran stated that on the same night she had previously testified as to her husband leaving with Orgovan, her husband returned but did not have the two pillowcases.
At the end of Mrs. Cochran's testimony the State rested its case and the defense made a motion to exclude the State's evidence on two grounds. First, the evidence was insufficient and second, the uncorroborated testimony of the accomplice was not sufficient.
The motion was denied and the defense called the appellant, R. A. (Bob) Thompson.
Thompson testified that he was vice president and half owner of the construction company, which was started by his father, Herman Thompson in 1945.
Thompson stated he had signed the contract with the Board of Education on behalf of Thompson Construction Company and that several sub-contractors were involved in the reconstruction of the Gadsden High School project. According to Thompson, their bills were submitted to Mr. Mabry, the clerk of the works project. Thompson testified that the Board of Education paid the billings directly to Thompson Construction Company and his company then paid the sub-contractors.
Thompson said his maid discovered the break-in of his office and he did not know that his records of the high school reconstruction project were missing until Thursday of the same week when a policeman called him and asked if they were missing. Thompson added that he checked, and found the records were missing and reported back to the police.
Thompson testified he had keys made on several occasions at the Eagle Key Company during 1973 and 1974, but that he did not have any duplicate keys made which he had given to Orgovan or to Cochran. He recalled that nine bottles of Wild Turkey whiskey were stolen during the burglary of construction office and that there could have been some other brands also stolen. Further, he said that he had given Orgovan a bottle of whiskey for Christmas and that he (Orgovan) had made some comment to him about claiming it as a loss on his insurance. Thompson stated he probably laughed at Orgovan at the time because he knew Orgovan was joking.
Thompson stated that he did not ask Cochran to break into the Gadsden City Board of Education Building to steal any records and that he never asked him to break into Thompson Construction Company. Further, Thompson testified that he did not pay Cochran any money.
Thompson did say, however, that in January, 1974, Cochran called him and asked him to meet him in a restaurant near his place of business. According to Thompson, Cochran produced some records from the Gadsden High School from his boots. Thompson said that Cochran asked him if he wanted to buy them and he told Cochran that at that time he was not interested.
*383 Further, Thompson said that the third set of the records concerning the high school job was kept in a trailer and was later put in the basement of the high school building. He testified that certain members of the board knew that a third set of the records existed.
According to Thompson, he first received notice of dissatisfaction by the Board of Education for the work he had done by a radio broadcast he had heard concerning a statement made by Jack Floyd. Thompson said that up until that point, he had not had any complaints.
During cross-examination, Thompson stated that he never informed the police of Cochran's attempted sale of the high school records and did not notify anyone of the third set of records.
Thompson admitted that he selected all of the sub-contractors except two, which were selected by the chairman of the Board. He further testified that he got a cut from the total price of the construction project, and the more it cost, the more he made.
On the completion of the appellant's testimony, the defense called a number of witnesses who testified to his good reputation, and, at the conclusion of this testimony, the defense rested its case.

I
The appellant contends that the trial court erred when it refused to grant his request for a change of venue. He claimed that widespread newspaper accounts, the radio broadcasts connected with the investigation and the rebuilding of the Gadsden High School, made it impossible for him to receive a fair trial.
We have examined the record in this case and have not found any newspaper articles or radio broadcast accounts concerning the case. The record does indicate, however, that an amended motion for change of venue was filed and a hearing was set on that motion, but nowhere does it indicate that any hearing was set for the original motion for a change of venue. Our examination indicated that on March 1, 1976, the amended motion for a change of venue was overruled, but nowhere does it indicate any evidence was produced or taken in behalf of the motion to change the venue. Further from the qualifying of the venire, none of the prospective jurors responded that they were aware of any publicity in the case.
In view of the fact that the appellant did not carry the burden of showing to the reasonable satisfaction of the court that an impartial trial by an unbiased jury could not be reasonably expected, this court will not interfere with the lower court's sound discretion in the matter. Flurry v. State, 52 Ala.App. 64, 289 So.2d 632; Hurley v. State, Ala.Crim.App., 335 So.2d 183.
No facts or circumstances were made to appear that would render a fair trial improbable. Without such a showing an application for a change of venue cannot be sustained, Haynes v. State, 40 Ala.App. 106, 109 So.2d 738; Lee v. State, 246 Ala. 343, 20 So.2d 471; Botsford v. State, 54 Ala.App. 482, 309 So.2d 835.
Widespread publicity alone would not indicate that the defendant would not get a fair and impartial trial. Some actual prejudice directed toward the accused resulting from the extensive publicity must be shown, thereby making it impossible to receive a fair and impartial trial in that particular county. Botsford, supra.

II
It is contended that the court was in error when it submitted the case to the jury on the basis of the alleged uncorroborated testimony of the accomplice. The appellant argues that the only evidence connecting him with the burglary of the Gadsden City Board of Education Building was the testimony of Ricky Cochran, an alleged accomplice. The appellant maintains this testimony was not corroborated as required by Sorrell v. State, 249 Ala. 292, 31 So.2d 82. The appellant submits that the proper test laid down in Sorrell, supra, for determining whether there was sufficient corroboration of testimony of an accomplice is
*384 "First to eliminate the evidence of the accomplice, and then, look to the remaining evidence. If there is sufficient and inculpatory evidence tending to connect the accused with the commission of the offense the corroboration is sufficient."
Whether such corroborative evidence exists is a question of law to be determined by the trial court, its probative force and sufficiency being questions for the jury. Berry v. State, 231 Ala. 437, 165 So. 97. The corroborative evidence need not be strong nor sufficient in itself to support the conviction, since the sole criterion is only that it legitimately tends to connect the accused with the offense. Goodman v. State, 52 Ala.App. 265, 291 So.2d 358.
Also, corroboration of an accomplice's testimony may be shown by circumstantial evidence. Hudson v. State, 49 Ala. App. 282, 270 So.2d 828; Pryor v. State, 47 Ala.App. 706, 260 So.2d 614.
As was stated in Goodman v. State, supra:
"Any circumstantial evidence is sufficient to corroborate if it proves that accused was connected with the criminal act, or tends to connect him with the commission thereof, or if such connection may reasonably or clearly be inferred from the corroborative evidence; and where the accomplice is strongly corroborated by facts and circumstances connecting accused with the crime, a conviction will be sustained." [Emphasis added].
The Supreme Court of Alabama observed in Miller v. State, 290 Ala. 248, 275 So.2d 675, that if the accused's connection with the offense can fairly be inferred from a survey of the corroborative circumstances surrounding the entire conduct of the accused, then the statute is satisfied.
In determining the question before us, we have surveyed the corroborating facts that have a tendency to connect the appellant with the burglary of the Gadsden Board of Education Building. Those facts are:
First, shortly after public allegations of overcharges by the appellant's company were made and following a request of an investigation, both sets of records relating to the high school reconstruction project were mysteriously stolen. One set from the education building and the other from the appellant's construction company office.
The fact that both existing sets of records on the high school reconstruction project were taken could reasonably cause a jury to believe the appellant had a motive; inference being, that the appellant was the one who stood to gain from the theft of the high school reconstruction records. Although, motive alone, is not sufficient to corroborate the testimony of an accomplice, it is legitimate evidence to be used in connection with other evidence in corroborating such testimony. Slayton v. State, 27 Ala.App. 422, 173 So. 632.
The theft of the records, under the circumstances, "tends to connect" Thompson with the crime and corroborate the accomplice's, Cochran, version of the burglary.
Two, the fact that no other records and no items of value were taken from the City Board of Education Building, and further, due to the fact that there was no evidence of forced entry could lead the jury to reasonably conclude that the appellant hired Cochran to remove the records from the education building.
Three, the fact that a piece of invoice from the stolen records was found on the table in the conference room where the missing records had been stacked, could reasonably lead the jury to believe that the removal of the records was done in great haste. This has a tendency to corroborate Cochran's testimony that, while he was placing the records in the pillowcases, he overheard the police shake the door at the back of the building.
Four, the appellant had been in the education building a number of occasions and would have knowledge of the location of the records, and, during those times could have borrowed the keys from Mr. Leftwich's desk. The conclusion which could be drawn from this fact is, that the keys were borrowed and duplicates made, which, in *385 effect, had a tendency to corroborate Cochran's story that he had been given keys to enter the education building.
Five, because Mr. Leftwich's testimony that the education building keys had been moved from one drawer to another would tend to corroborate Cochran's testimony that he had been provided with duplicate keys.
Six, the testimony of the accomplice's wife, Clara, that on the very weekend when the records were taken, Fred Orgovan came to her house and that he and her husband left, with her husband carrying two pillowcases. This testimony would corroborate Cochran's testimony that Orgovan had come to his house and that he had taken two pillowcases for the purpose of placing the records in them.
Seven, Mrs. Cochran's further testimony that later in the night her husband returned and he did not have the pillowcases, but did have a cigarette lighter which had the inscription, "Thompson Construction Company," and a brown bottle containing liquor. The pillowcases, however, were not returned. This testimony has a tendency to corroborate Cochran's testimony that the pillowcases were used to carry the stolen records, and, further tends to corroborate the evidence of the burglary at the appellant's construction company. It supports the accomplice's story concerning bottles of Wild Turkey liquor, along with other liquor in a tall, brown, bottle being taken during the burglary of the construction company.
Eight, also Mrs. Cochran testified her husband gave her two one-hundred-dollar bills and some twenty-dollar bills a few days after the burglary. This corroborates Cochran's testimony that the appellant paid him the final three hundred dollars of the agreed amount of five hundred dollars in the form which he had indicated at trial.
Nine, the fact that only the records dealing with the reconstruction project were removed from the education building, and nothing more, would have a tendency to corroborate Cochran's testimony that the appellant had given him a diagram of the education building, showing the location of the records.
Ten, the testimony of Mr. McBrayer, owner of the Eagle Locksmith and Key Service, that on January 19, 1974, about ten days prior to the burglary, the appellant had come to the shop and had two duplicate keys made. This corroborates Cochran's testimony that prior to the burglary the appellant had inquired if Cochran would like to use some keys in order to gain entrance into the education building. Further, it supports Cochran's story of being provided with keys which he said bore the word, "Eagle." Also, it supports what Cochran said pertaining to appellant telling him to "file the imprint of the word `Eagle' off the keys." Inference being that, if the keys were dropped or lost, the tracing of their origin would be difficult.
Eleven, the testimony of Joseph Cramer, a former employee of Orgovan, revealed that, shortly after the burglary of the appellant's construction company, he overheard Orgovan say to appellant; "Well, you can't claim that Wild Turkeyor Old Turkey on your insurance and I'll sure enjoy drinking it." Cramer stated that the appellant asked, "where did you find it?" Orgovan replied, "under your deskor under the counter." Cramer said that when Orgovan noticed that he had been listening, he said; "Cramer, what are you doing?" This testimony corroborates Cochran's statements that the appellant sought out him and Orgovan for the purpose of burglarizing the education building and his (Thompson's) construction company.
Twelve, Detective Connell's testimony that glass was found inside the drawer of a desk in the ransacked construction company office, which seemed to support Cochran's testimony concerning the breaking in of appellant's construction company.
Further, it supports the theory that the construction company office burglary was done in an effort to cover-up a removal of the construction company's copies of the high school reconstruction project records. This further supports Cochran's testimony, that, after he had gone into the construction *386 company through the door that had been left open, he departed but subsequently returned. On his return, he broke out the window so that it would appear that it had been a forced entry.
A jury could reasonably infer from the foregoing facts that a person who was part-owner in a construction business, holding a cost-plus three percent reconstruction contract, would, after public allegations of overcharging which called for an investigation by the attorney general, seek out someone to burglarize the offices where the records of the project were kept, the obvious reason being to prevent detection and conviction.
In our judgment, sufficient evidence was shown to corroborate the accomplice's testimony and the question was correctly submitted to the jury.

III
The appellant next complains that the trial court was in error when it overruled his objections to the admission of testimony relating to the burglary of Thompson's Construction Company. Counsel argues that the appellant was not indicted or charged with the burglary of Thompson Construction Company, and this testimony should not have been given to the jury.
Generally, evidence of collateral crimes are not admissible in the trial of a person charged with a different crime, but exceptions to this rule exists. Murphy v. State, 52 Ala.App. 490, 294 So.2d 457. These exceptions were enumerated in Murphy, supra, and shows their origin as Wharton's Criminal Evidence, § 31.
Further, this court in Wilkins v. State, 29 Ala.App. 349, 197 So. 75, stated:
"... proof of such collateral offenses cannot be used as substantive evidence to establish the guilt of the accused as to the crime charged. 20 Am. Jur., § 309, pp. 287, 288. Wharton's Criminal Evidence, 10th Ed. Volume 1, § 30, p. 59. This well-established principle of criminal evidence, however, is subject to several, equally well-established exceptions, which include cases where intent or identity is involved. As found in 22 R.C.L., § 39, p. 1204: `But this general rule is not to be followed blindly and evidence rejected on the sole ground that it does show the commission of another crime. If evidence is relevant and competent it should be admitted regardless of its incidental effect. Accordingly it is held that evidence of another crime is admissible where it tends to identify the accused.'
"And we also add that such evidence should also be admitted where it tends to show the intent with which the act was done. Or as stated in Underhill's Criminal Evidence, 4th Ed., § 181, p. 318: `To this general rule there are several distinct exceptions which have been permitted from absolute necessity, to aid in the detection and punishment of crime. These exceptions ought to be carefully limited and guarded by the courts and their number should not be increased. But it must be admitted that the modern tendency on the part of the courts is to be liberal in the admission of evidence of collateral crimes.'"
However, where two or more crimes "constitute one criminal action," evidence of the other crime or crimes is admissible. Brown v. State, Ala.Crim.App., 338 So.2d 1050; Summers v. State, Ala.Crim.App., 348 So.2d 1126, See McElroy's Law of Evidence in Alabama, 2nd Ed., § 69.01(3). In Brown, supra, this court in quoting McElroy, supra, stated in substance, that where crimes are inseparably connected then evidence of the accused's commission of the other crime is admissible where it is "part of the res gestae" or where the crimes are part of one continuous transaction.
In Mason and Franklin v. State, 42 Ala. 532, the Supreme Court of Alabama stated:
"... although evidence offered in support of an indictment for felony, be proof of another felony, that circumstance does not render it inadmissible, if the evidence be otherwise receivable; and the books abound in cases in which such evidence has been ruled to be proper to prove scienter, to establish identity, to *387 make out the res gestae, or to make out a chain of circumstantial evidence of guilty in respect to the act charged ...
"The conviction of the prisoners in the present case, depended entirely upon circumstantial evidence; and any indications of guilt arising from the conduct, demeanor, or expressions of the parties, were legal evidence against them. `The law can never limit the number or kind of such indications' ....
"In making inquiry as to these indications, the circumstances pointing to a connection of the prisoners with the three burglaries, were so intermixed, that it was proper, if not a necessity, to hear the evidence relating to them all. In The King v. Whiley and Haines, (1 Leading Criminal Cases, 185,) Lord Ellenborough, in delivering the opinion of the court, said: `If several and distinct offenses do intermix and blend themselves with each other, the detail of the party's whole conduct must be pursued. There is a case where a man committed three burglaries in one night, and stole a shirt at one place and left it at another; and they were all so connected that the court heard the history of the three different burglaries.'... [Emphasis added].
"To have excluded the evidence in the present case, relating to the burglaries for which the prisoners were not on trial, would have broken the chain, formed of links more or less perfect, connecting them with the one which constituted the subject matter of the trial....
"If one or more links of that chain consist of circumstances which tend to prove the prisoner has been guilty of other crimes than that charged, this is no reason why the court should exclude those circumstances. They are so intimately connected and blended with the main facts adduced in evidence, that they can not be departed from with propriety; and there is no reason why the criminality of such intimate and connected circumstances should exclude them, more than other facts apparently innocent."
In the case at bar, an examination of the evidence indicates that circumstances connecting the appellant with the two burglaries did exist, and, further, that a reading of these facts show that they were intermixed. The testimony of the accomplice, Cochran, is corroborated by separate evidence, that he did, in fact, burglarize the board of education building and appellant's construction company. Further, the overall motive for the two burglaries was for the destruction of the high school reconstruction project records. Without the destruction of both sets of records, the appellant may have been charged and convicted on the overcharge allegation. Also, a circumstance that must be considered is the fact that the buildings were in close proximity and, from aught, that appeared, the burglary of the construction company was committed immediately after the break-in at the education building.
When all the evidence in this case is considered together, it is our judgment that a "chain" of circumstantial evidence is formed, which connects the appellant with the burglary of the Gadsden City Board of Education Building.
In view of the foregoing, the admission of the testimony concerning the burglary of the appellant's construction company office was admissible. We have examined the record and a search thereof, reveals no error, therefore, the judgment is due to be affirmed.
AFFIRMED.
HARRIS, P. J., and TYSON, J., concur.
BOOKOUT, J., concurs in result.
BOWEN, J., recuses.
BOWEN, Judge, recusing.
Under Canon 3(C) of The Canons of Judicial Ethics, a judge should disqualify himself in a proceeding in which he has a personal knowledge of disputed evidentiary facts concerning the proceeding. As an Assistant Attorney General I was assigned to aid in the investigation of the case now under review. For that reason, I recuse myself from this case.