Bennie Johnson was indicted in Lee County for assault with intent to murder, § 13-1-46, Code of Alabama 1975, and was found guilty as charged by a jury, and was sentenced to serve twenty years in the state penitentiary. He brings this appeal from that verdict and judgment in forma pauperis. The victim of the assault, Jo Nell Fitch, a resident of Opelika, testified that, on the morning of September 28, 1979, she had been at the home of her sister, Bertha Mae Tools, washing clothes. At some point the electricity went off, and Ms. Fitch and her sister were sitting in the den waiting for the power to come back on when Ms. Fitch saw appellant's car stop outside the house. Ms. Fitch stated that appellant, whom she had known for several years, knocked on the kitchen door and then entered the house, said "good morning," and "asked my sister if I can speak with you for a minute" (R. 12); the witness testified that Bertha Mae Tools got up and went into the kitchen with appellant. Ms. Fitch was starting to light a cigarette when "I looked up, I seen him standing there holding a gun. He was firing and shooting at me" (R. 12). She stated that appellant said nothing but was only "gritting his teeth and pulling the trigger" (R. 13). Ms. Fitch further testified that she was struck twice by bullets, and that she blanked out for a short time, reviving in time to hear appellant "outside, out there, shooting." The witness stated that she was in intensive care at the hospital for twenty-eight days, and under regular care for a longer period, and underwent treatment for gunshot wounds to the jaw and head.
Bertha Mae Tools testified that she had formerly dated appellant, but they had broken up before September 29, 1979. On that date, she testified, she had returned from work and was talking to her sister, Jo Nell Fitch, when appellant knocked on the door. She stated that she invited him into the house, that he entered, said good morning, and asked to speak to her. Ms. Tools testified that she then saw that appellant was holding a pistol and "I asked him to leave then" (R. 22). She then began "pushing on him" toward the door, at which point appellant "said I will shoot all three of us" (R. 23). She stated that appellant's pistol then fired two shots, and that she began running because "I thought he was going to shoot me" (R. 24). She did not know whether Jo Nell Fitch had been wounded at that point or not. She further testified that she ran out of the door, jumped over the hood of a car and fell over a fence, and that appellant followed and shot at her several more times. Appellant, after having fired what the witness estimated to be two shots outside the house, returned to his car, which was an older model painted white, and left. The witness returned to her house, discovered that her sister had been shot, and called the police and medical help.
On cross-examination, Ms. Tools testified that she was pushing appellant fairly hard, *Page 1162 
either by the shoulders or chest, when the shots inside the house were fired. She further stated that she did not smell alcohol on appellant's breath, but had not paid that much attention.
Ms. Tools further testified on re-direct examination that on that day she had seen appellant at her place of employment, but had only waved, and had not invited him to come over to her house. She stated that she had broken up with appellant about two months previously.
Michael Jackson, a next door neighbor to Bertha Mae Tools, testified that, on the morning in question he had been lying down in his house when he heard "something like shots." He stated that he got up and ran to his front door and "heard somebody running and hollering for help, and all at the same time I heard the shots" (R. 33). The witness testified that he could not see who it was doing the yelling, but did see appellant get into a "light yellow-cream looking kind of car" (R. 35), and drive off. The witness further testified that he summoned the police, but never went into the house next door. In his judgment, he heard two or three shots.
Stanley Lee Chapman, a patrolman with the Opelika Police Department, testified that, on September 28, 1979, he had investigated a shooting at the residence of Bertha Mae Tools. He stated that, upon his arrival, he found a black female, who appeared to be wounded on the head, sitting in a chair. Other persons at the scene were able to give Officer Chapman a description of the woman's assailant, though none knew his name, and Officer Chapman relayed the description of the individual and his car to other police units.
Dan Davis, a captain of police with the same department, testified that, on the date in question, he and Officer Charles Minor had just left the Opelika Police Station in an unmarked car when they received a radio message advising them to keep a lookout for appellant, and furnishing a description of his car. Captain Davis stated that, though he did not know appellant, Officer Minor did, and during their patrol Officer Minor saw appellant and alerted Captain Davis. At that point, Captain Davis testified, he turned on his vehicle's blue light and "attempted to stop him" (R. 42). Appellant pulled his car over after traveling about a block, but when the officers approached appellant's vehicle and instructed him to get out with his hands raised, appellant "sped off from us then and we gave pursuit for approximately three blocks, at which time he stopped again . . . and refused to get out" (R. 42). Captain Davis further testified that he and Officer Minor again ordered appellant out of the car. The third officer, an Officer Weaver, ran to appellant's car and grabbed appellant's hands while Captain Davis ran to the car's passenger side and "retrieved a pistol that was in between the two seats of the front of the car" (R. 42). Captain Davis stated that he subsequently turned the pistol over to Officer Jones, and that when he examined the weapon it was loaded with six shells, three spent and three live rounds. The witness further stated that he saw spent shells and an ammunition box on the floor of appellant's car.
On cross-examination, Captain Davis stated that he arrested appellant within thirty to forty-five minutes of the shooting, and that he did not smell alcohol about appellant's person. He did not give appellant a sobriety test, nor did he know of one being given appellant.
Under further questioning on re-direct examination, the witness testified that appellant resisted arrest by attempting to reach the pistol between the seats when he was stopped the second time.
Robert Buford Jones, a detective-sergeant with the Opelika Police Department, stated that, when he arrived at the Tools' residence on the day in question, he witnessed Jo Nell Fitch, who had suffered a gunshot wound to the face, being placed in an ambulance. He further testified that, upon entering the house, he saw a black chair covered with blood, and a bullet hole in one wall; also, he noticed that the front door had a window which had been shattered. The witness identified several *Page 1163 
photographs of the scene, and these were received in evidence. Sergeant Jones further testified that he received a description of appellant and his car, and broadcast that over the police radio. About forty-five minutes later, the witness stated, he received a radio dispatch from Captain Davis requesting him to come to the location of a stopped vehicle. Sergeant Jones testified that he and Captain Abbott drove to the scene and found appellant in custody and his vehicle parked on the street. An examination of the car revealed a partially filled box of .38 caliber ammunition. Further, the witness stated, Captain Davis gave him a blue steel .38 Titan Tiger, two-inch, six-shot revolver, which had been taken from appellant; this weapon was identified and received in evidence.
Outside the presence of the jury, Sergeant Jones testified that he and Captain Abbott talked to appellant in Captain Abbott's office at the Opelika Police station around 4:55 p.m. on the day in question, which would have been at least four hours after appellant's arrest. Sergeant Jones stated that appellant did not appear intoxicated, and had no trouble in understanding or communicating with the officers. The witness further testified that appellant was advised from a "rights form" of his rights to remain silent and to have an attorney present, and that appellant, who stated that he could read and write, was shown the form. Appellant, when asked if he understood his rights, "replied that he did" (R. 58) and "replied that he did want to make a statement" (R. 59), without an attorney being present. At that point, Sergeant Jones stated, appellant was read a "waiver of rights" form, and appellant signed the form after acknowledging that he understood its contents. The form containing both the rights paragraph and waiver was received in evidence.
Still outside the presence of the jury, Sergeant Jones testified that appellant had not been offered any reward or hope of reward, nor had appellant been threatened or coerced. He further stated that appellant then made an oral statement, which statement Sergeant Jones transcribed in his handwriting. Appellant read the written statement over, stated that he understood same and signed the paper.
On cross-examination the witness stated that the delay between appellant's arrest and the taking of the statement was due to various administrative reasons, and not because of appellant's intoxication in the interim. Sergeant Jones stated that he did not think appellant was intoxicated at the time of his arrest, and that he did not smell alcohol about appellant when the statement was taken.
Appellant was called to the stand during the hearing outside the presence of the jury, and testified that, at the time of his arrest, he had consumed "a pint and a half of liquor" (R. 65), which he described as gin or "white liquor." He stated that he had started drinking around 9:00 o'clock that morning, and had consumed three half-pints of gin by the time of the shooting; he did not drink any after the shooting. Appellant further testified that, in his opinion, he was intoxicated when arrested, and that the police had given him an intoximeter test and then charged him with driving while intoxicated. He stated that he received thirty days in jail on that charge and was also fined. After his arrest, he stated, he was taken to the police station and placed in a cell, where he took a nap. He was subsequently taken out of the cell because "they wanted me to sign that writing and statement" (R. 66), which appellant refused to do; he was then returned to the cell. He stated that some time later the officers returned with the statement, wanting him to sign it, and promised him cigarettes if he would do so. Appellant identified Captain Abbott as the man offering the cigarettes. Eventually, appellant stated, he went upstairs and signed the form and statement. He testified that he was still intoxicated, and was willing to sign the statement in order to get some cigarettes.
On cross-examination, appellant acknowledged that he could read, though not very well, and stated that the signature on the rights form "looks like mine". (R. 68). *Page 1164 
He denied that he was informed of his rights. Appellant reiterated that he had been drinking before the shooting, and that the police had smelled alcohol on him. He denied reading his statement over, and denied that it had been read to him, although the statement was shown to him. Appellant further stated that he only told the officers what he could remember about the events in question, given his intoxication.
At this point the trial court ruled that appellant's statement had been voluntarily made, and could be submitted to the jury.
With the jury present, Sergeant Davis recounted the testimony he had given during the hearing, and read appellant's statement, reduced to writing by the officer:
 "This morning I saw my lady friend, Bertha Tools, at the Medical Arts Center in Opelika. She told me we was through and to bring her her clothes which were at my trailer and that she would give me back my wife Lois' gun, which was at her house. I got her clothes and went to her house on Dogwood. I went to her house and she went to her bedroom and got the gun and gave it to me. Bertha and her sister, Jo Nell, were there. I told her to go out to the car and get her clothes, but she wouldn't do it. I backed the hammer and she said quit playing with the gun, but I told her that I wasn't playing, to go get her clothes. Bertha's sister started cussing me so I shot her one time that I remember. Bertha started hollering and ran out the door, so I shot at her two or three times. Then I got in my car and left. I thought I had hit Bertha, too. She hollered and fell one time, but I guess I didn't. And then we concluded the statement with the above and one-quarter page statement, has been read to me and by me and is true and correct." (R. 77-78)
Robert Glenn Brown, a medical specialist in plastic and reconstruction surgery, testified that he had first examined Jo Nell Fitch on September 28, 1979, and that he found that she had suffered a gunshot wound to the right cheek. Doctor Brown stated that the bullet entered Ms. Fitch's right cheek, crossed between her upper and lower teeth, destroying many of these, shattered the jaw bone, and finally lodged near the third vertebrae of the neck. Doctor Brown further stated that he cleaned the wounds and removed the bullet, and at one point during this procedure was forced to perform an emergency tracheotomy because Ms. Fitch stopped breathing. Ms. Fitch was operated on again the following day in order to ascertain if she had aspirated any pieces of tooth. The witness further testified that Ms. Fitch would have to have dentures and that her jaw was displaced somewhat; she also had a persistent pain in her arm that was possibly related to her injuries.
John Helms testified that he was an employee of Story's Incorporated, located in Opelika, and that on September 28, 1979, he had been questioned by the police as to the purchase of ammunition of a particular caliber. Mr. Helms testified that, at the time he was questioned, he had made only one sale of ammunition that day, to appellant. He stated that appellant had entered the store on that morning and wanted to purchase ammunition for a handgun which he thought to be a .32 caliber. Mr. Helms testified that, as required by law, he asked to see appellant's driver's license and recorded appellant's name, date of birth, address, type of ammunition purchased and similar information. After this sale, the witness testified, appellant, who was "very calm . . . an easy going person" (R. 89), left but returned some twenty to twenty-five minutes later to say that he had bought the wrong sized ammunition. Mr. Helms stated that he suggested another size, and appellant agreed to try that ammunition; the witness stated that he then changed the records to reflect the swap, and appellant left. About an hour and forty-five minutes later, Mr. Helms testified, a police officer entered the store and asked about the sale of ammunition; he showed Mr. Helms several photographs, and the witness "picked out a picture that I was one hundred percent positive as being the individual who purchased the ammunition" (R. 90). The *Page 1165 
witness further identified the individual as appellant, and stated that he did not smell alcohol about appellant, nor did appellant appear or act intoxicated.
On cross-examination, the witness estimated the time that appellant first entered the store that morning to be 8:30.
The State rested, and appellant's motion to exclude was overruled by the trial court.
Appellant was called to the stand and testified that, as far as he could remember he had arrived at Ms. Tools' house at shortly after 10:00 a.m. on September 28, 1979; he had gone there to retrieve a pistol and give Ms. Tools some clothes that she had left at appellant's trailer. Further, appellant testified, Ms. Tools had called him three times that morning, at 1:00, 3:00 and 5:00 in order to inform appellant that their relationship was over. Appellant testified that he then told her that he wanted his gun back, and that he had given it to Ms. Tools because he was afraid that his wife would shoot him with it. He stated that, upon his arrival at the Tools' house, Ms. Tools and Jo Nell Fitch were seated in the den, and that he greeted them and asked Ms. Tools for the gun. Ms. Tools went into the bedroom to retrieve it, and appellant stated that he followed her and got the pistol. When they returned to the den, he stated, Ms. Tools began pushing him toward the front door and that he thought Jo Nell Fitch was cursing him as well. At some point the pistol went off, and Ms. Tools ran out the front door; appellant testified that he could not remember shooting after her. He further stated that he had not purchased any bullets for the weapon until after this shooting incident.
Appellant testified that he was a former member of Alcoholics Anonymous, but had resumed drinking and was intoxicated when the shooting took place. He stated that, upon his arrest, he was given an intoximeter test, and that he received a jail sentence and fine for driving while intoxicated. He further stated that he was given two packs of cigarettes in exchange for making a statement, but that he had been unable to read the statement after it had been written down. He denied aiming at Jo Nell Fitch and denied any intent to kill her.
On cross-examination, appellant reiterated that he had met Ms. Tools at the Medical Arts Building, where she had a second job, as he had been doing for the past two months, and that Ms. Tools informed him that their relationship was at an end. After that, appellant stated, he went home and began drinking. He arrived at Ms. Tools' at a little after 10:00 that morning and had not gone to Story's by that time; he stated that John Helms had not been telling the truth as to when he had come into Story's. Appellant denied pointing the pistol at Ms. Fitch, saying instead that he was looking at Ms. Tools, and that the pistol went off accidentally. He similarly denied firing any shot at Ms. Tools that broke the window in the front door, and denied shooting at her outside the house. After this, appellant stated, he then went to Story's, bought some ammunition and "went and shot my wife with the bullets, what I got from Story's (R. 112). He was arrested later for driving while intoxicated, he stated, and could not remember attempting to elude the police or reaching for the pistol in the car.
The defense having rested after appellant's testimony, the State recalled Bertha Mae Tools in rebuttal. Ms. Tools testified that, on the night before the shooting, she had been at work in a manufacturing plant and had not called appellant. She saw appellant at the place of her second job, the Medical Arts Building, but stated that he was there to paint the building and that she only waved to him. She denied having the pistol, but stated that appellant had the gun with him when he arrived that morning.
 I
During the cross-examination of appellant by the prosecutor, the following occurred:
"Q. What did you do after you left Story's?
 "MR. BJURBERG: Objection, Your Honor, if he's going into a collateral matter other than just — *Page 1166 
"THE WITNESS: Well, I have —
"MR. BJURBERG: Just a moment, Mr. Johnson.
 "THE COURT: Well, I assume this is for the purpose of showing flight.
 "MR. MYERS: I want to show flight and I also want to show intent that the shooting was no accident.
"THE COURT: Overruled.
 "A. I got another case up there and I went and got the bullets and went and shot my wife with the bullets, what I got from Story's.
"Q. Was that another one of those accidents?
"A. No, sir.
"Q. Then what did you do?
 "A. I rode around until the police caught me, got me for D.W.I." (R. 112)
Appellant argues that prejudicial error was committed by the trial court in allowing testimony as to the shooting of appellant's wife, which we understand from the attachment to appellant's brief to be the subject of another indictment of appellant for assault with intent to murder. There is no further testimony in the record as to the details of this second shooting, but we perceive from the above-quoted statement and the testimony of the police officers involved that the shooting of appellant's wife must have occurred in the thirty to forty-five minute interval between the shooting of Jo Nell Fitch and appellant's arrest.
It is, of course, the general rule in Alabama that evidence of acts which would in themselves constitute distinct and independent offenses is inadmissible. Williams v. State, Ala.,350 So.2d 708 (1977), Hayes v. State, Ala.Cr.App.,384 So.2d 623 (1979); writ quashed, Ala., 384 So.2d 627 (1980); Thompsonv. State, Ala.Cr.App., 374 So.2d 377 (1978), affirmed, Ala.,374 So.2d 388 (1979).
 "The apparent justification for the rule is that the introduction of evidence of other separate and distinct offenses requires the accused to defend himself against charges which do not form a part of the indictment and which the defendant is not called on to answer. Garner v. State, 269 Ala. 531, 114 So.2d 385 (1959); Mason v. State, 259 Ala. 438, 66 So.2d 557 (1953). Alternatively, it has been suggested that the actual justification is that in the setting of a jury trial, the probative value of the evidence is outweighed by the danger of prejudice. McCormick § 190, at 447."
Lucy v. State, Ala.Cr.App., 340 So.2d 840, cert. denied, Ala.,340 So.2d 847 (1976). There are, however, several exceptions which render the general rule inapplicable, and evidence submitted under any of these exceptions is relevant and admissible, despite the fact that it indicates the commission of a distinct crime. In Hayes v. State, supra, we noted these exceptions as gathered in Wharton's Criminal Evidence at § 31:
 "(1) Relevancy as part of the res gestae. (2) Relevancy to prove identity of person or of crime. (3) Relevancy to prove scienter, or guilty knowledge. (4) Relevancy to prove intent. (5) Relevancy to show motive. (6) Relevancy to prove system. (7) Relevancy to prove malice. (8) Relevancy to rebut special defenses. (9) Relevancy in various particular crimes."
See, also, Scott v. State, Ala.Cr.App., 353 So.2d 36, cert.denied, Ala., 353 So.2d 40 (1977); Lucy v. State, supra; Heardv. State, Ala.Cr.App., 335 So.2d 679 (1976); Hardy v. State,51 Ala. App. 489, 286 So.2d 899 (1973).
We have carefully examined the facts of this case as presented by the testimony in the record, and conclude that the disputed evidence was properly admitted as bearing on appellant's intent at the time of the shooting of Jo Nell Fitch. At 2 Wigmore, Evidence § 363 (Chadbourne Rev. 1979), the following discussion of the proof of intent is found:
 "The intent principle . . . receives constant application; for in homicide the intent to kill is practically always in issue. It is to be proved by the prosecution, and the recurrence of other acts of the sort tends to negative inadvertence, defensive purpose, or any other form of innocent intent. For this purpose, therefore, the *Page 1167 
evidence is receivable irrespective of whether the act charged is itself conceded or not . . . As to the similarity of the other acts, no fixed rule can be formulated. They certainly need not have been done to the same person; they need not have accompanied more or less immediately the act charged, and they may have been done even at a subsequent time. The precedents show every variety of circumstances, and a correct application of the principle would receive any evidence of the sort which conveys any real probative indication of the defendant's intent." (Footnotes omitted)
Cf. McKenzie v. State, 250 Ala. 178, 33 So.2d 488 (1947) [assault with intent to rape]; Hayes v. State, supra [assault with intent to murder]; Hogue v. State, 54 Ala. App. 682,312 So.2d 86 (1975) [assault with intent to rape]; C. Gamble,McElroy's Alabama Evidence, § 69.01 (5) (3d Ed. 1977). An examination of the facts here presented shows that the evidence is undisputed that appellant was in possession of the pistol when it discharged, wounding Jo Nell Fitch, although appellant ascribes his actions to either accident or the effects of intoxication, or both. And, as we interpret the sequence of events after the shooting of Ms. Fitch, at least as urged by appellant, appellant left his estranged girlfriend's house, drove to Story's and purchased more ammunition, and then shot his wife, all before his arrest some thirty to forty-five minutes after the Fitch shooting. From this we find that the question of appellant's intent in shooting Jo Nell Fitch was very much in issue and thus the evidence of his subsequent actions, which were not far removed in time, was quite relevant to this question of intent for whatever value the jury would place on it. And though we note that this line of testimony was never fully developed, we hold that the trial court did not commit error in overruling appellant's objection to the questioning that did occur.
 II
Appellant next contends that the trial court erred in overruling his motion to exclude, made at the conclusion of the State's case-in-chief, in that the State failed to prove beyond a reasonable doubt that appellant had the requisite intent to murder Jo Nell Fitch. Under the terms of our statute, § 13-1-46, Code of Alabama 1975, for the offense of assault with intent to murder, it is necessary that the State prove both the existence of an assault and the intent to kill under circumstances which would constitute murder if an actual killing had resulted. McArdle v. State, Ala.Cr.App.,372 So.2d 897, cert. denied, Ala., 372 So.2d 902 (1979); Hall v. State, Ala.Cr.App., 348 So.2d 870, cert. denied, Ala., 348 So.2d 875
(1977), cert. denied, 434 U.S. 1021, 98 S.Ct. 745,54 L.Ed.2d 768 (1978); Hamm v. State, 56 Ala. App. 632, 324 So.2d 345
(1975). Because the element of intent, being a state of mind or mental purpose, is usually incapable of direct proof, it may be inferred from the character of the assault, the use of a deadly weapon and other attendant circumstances. Cases cited, and seeSmith v. State, Ala.Cr.App., 344 So.2d 213 (1977); Baldwin v.State, Ala.Cr.App., 342 So.2d 940 (1977); Tolliver v. State,50 Ala. App. 654, 282 So.2d 92 (1973).
We have set out the evidence adduced at trial in some detail in the first portion of this opinion, and see no reason to repeat that evidence here. Notwithstanding appellant's claims that the gun accidentally fired during his struggle with Ms. Tools and that he was intoxicated at the time, ample evidence was available to indicate that appellant was not intoxicated, had purchased ammunition before the shooting, in fact aimed at Ms. Fitch, and had threatened to kill Ms. Fitch, Ms. Tools and himself. Any discrepancies presented a jury question, and it was properly left to the jury to decide whether appellant had intended to murder Jo Nell Fitch. The trial court did not err in overruling appellant's motion to exclude.
We have carefully reviewed the record in this cause and find same to be free from reversible error; the judgment is therefore
AFFIRMED.
All the Judges concur. *Page 1168