[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 227 
David Larry Nelson, appellant, was initially indicted for the capital offense of murder in the first degree wherein two or more human beings are intentionally killed by the defendant by one or a series of acts. Ala. Code § 13-11-2(a)(10) (1975). Appellant filed a motion to quash the indictment, which was overruled by the trial court after the parties agreed by stipulation that the initial indictment be nol prossed and that Nelson be indicted instead for two separate capital murder offenses, one for robbery or attempts thereof when the victim is intentionally killed by the defendant, § 13-11-2(a)(2), and one for any murder committed by a defendant who has been convicted of murder in the first or second degree in the twenty years preceding the crime. § 13-11-2(a)(13). Subsequently, Nelson was indicted in two separate indictments: One for the intentional killing of James Dewey Cash,[1] while in the course of *Page 228 
robbing him, and one for the murder of Wilson W. Thompson after having been convicted of murder in the second degree within twenty years preceding the murder of Thompson. The case now before us arises out of the indictment of Nelson for the murder of Thompson after having been convicted of another murder within the preceding twenty years. Omitting its formal parts, the indictment upon which Nelson was tried reads, as follows:
 "The grand jury of said county charge that, before the finding of this indictment, David Larry Nelson, . . . subsequent to March 7, 1976, unlawfully and with malice aforethought, killed Wilson W. Thompson, by shooting him with a pistol, after the said defendant having been convicted of murder in the second degree on to-wit: August 28, 1974 in the Circuit Court of Jefferson County, Alabama, Birmingham Division, in violation of Section 13-11-2(13) Code of Alabama, 1975 against the peace and dignity of the State of Alabama."
Nelson was first tried for this offense in October 1978, found guilty as charged in the indictment, by jury verdict, and sentenced to death by the trial court. On appeal, this court reversed and remanded the case for a new trial on the mandate of Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382,65 L.Ed.2d 392, on remand, 396 So.2d 645 (Ala. 1980), and Ritter v. State,403 So.2d 154 (Ala. 1981). Nelson v. State, 405 So.2d 50
(Ala.Cr.App. 1981).
The instant appeal is from Nelson's second trial on the same indictment wherein he was convicted again for the same capital offense. § 13-11-2(a)(13).[2] The second trial was conducted in accordance with the bifurcated procedures outlined in Beck v.State, 396 So.2d 645 (Ala. 1980). As in the first trial, the jury found Nelson guilty of "the capital offense of murder in the first degree, after having been previously convicted of murder in the second degree within 20 years of said crime, as charged in the indictment." After a separate sentencing hearing, and by unanimous decision, the jury fixed his punishment at death. The trial court then held a second sentencing hearing on aggravating and mitigating circumstances, and found the existence of two aggravating circumstances and no mitigating circumstances. The trial court weighed the aggravating circumstances, while noting the absence of mitigating circumstances, and on April 2, 1982, sentenced Nelson to death, thereby accepting the death penalty as recommended by the jury. As noted above, it is from this second conviction and sentence of death that Nelson now prosecutes this appeal.
As alleged in the capital indictment, Nelson was previously convicted of murder in the second degree in the Circuit Court of Jefferson County on August 28, 1974, and sentenced to twelve years in the penitentiary. Nelson pled guilty to this prior offense and was represented at the time by court-appointed counsel. This prior conviction was proven by the State. The truth of this allegation is not contested by Nelson, but is admitted.
The evidence presented by the State shows that Nelson and his girlfriend of a month, Linda Vice, traveled from Anniston to Birmingham a few days prior to January 1, 1978. They traveled by automobile. It is not clear from the record whether the automobile was borrowed and not returned or was stolen. Apparently, the automobile "tore up" in Birmingham and was abandoned. It was ultimately found in the parking lot of the Red Dog Saloon in Birmingham. On this visit, Nelson was armed with a .38 caliber pistol, which belonged to *Page 229 
Linda Vice's uncle. Apparently, they spent one night at the Siesta Motel in Irondale, one night at the Birmingham bus station, and one night at a Salvation Army installation. It also appears that they spent some time visiting lounges and nightclubs in the Birmingham area.
On the evening of December 31, 1977, Nelson and Vice were at Theo's Lounge in Birmingham, having arrived there around 10:00 p.m. While there, they met the victim, Wilson W. Thompson, and Nelson introduced Vice to Thompson as his sister. They told Thompson that they did not have a way home. Thompson and Nelson discussed going to Thompson's mobile home in Kimberly, which was twenty to thirty miles from Birmingham, and having an "orgy." Each stated that he had engaged in orgies with his sister. Thompson, Nelson, and Vice left the lounge around 1:30 a.m., January 1, 1978, and arrived at Thompson's mobile home about thirty minutes later. They traveled in Thompson's automobile. After entering the mobile home, Thompson fixed everyone a drink. After some further discussion of orgies, Nelson ordered Vice to remove her clothes. When she expressed some reluctance, Nelson took her into the bedroom and told her to take something off. She removed her blouse, at which time Thompson, who was nude, entered the bedroom and told her to remove the rest of her clothing. She did. Nelson ordered her to lie on the bed and she complied. Nelson then told Thompson he could have oral sex with Vice. Just as Thompson commenced performing oral sex on Vice, Nelson shot him in the back of the neck at close range with the .38 caliber pistol. The bullet apparently passed through Thompson's neck and wounded Vice in the upper part of her leg. Thompson fell forward on the bed, and Vice raised up and started screaming. Nelson then shot twice at Vice, one bullet wounding her in the wrist and the other grazing the back of her head. She fell to the floor and remained there. She observed Nelson hit Thompson in the back of the head with the pistol. She could hear Nelson "ransacking" the mobile home. Nelson returned to the bedroom and, upon finding Vice alive, displayed his penis and tried to get Vice to perform oral sex upon him. She refused, telling him that she was dying and that he was not going to make her do anything else. Nelson threw a blanket over her and walked out.
Shortly thereafter, Vice wrapped a blanket about herself and fled from the mobile home. She observed Nelson sitting on the living room couch as she ran out. She ran about two hundred yards to a nearby house where Lorrine Hayes resided. She knocked on the door and Mrs. Hayes let her in. It was approximately 4:00 a.m., Vice was nude, drenched in blood, and bleeding from three wounds. As Vice lay on the floor, Mrs. Hayes wrapped her in towels. The police and ambulance were called. There was considerable delay in the arrival of the police and ambulance due to the heavy activity of New Year's Eve. During this time, someone knocked on Mrs. Hayes's door for an hour and forty-five minutes or longer. She would not admit the person and did not know who it was. When approaching the Hayes residence, two officers responding to the call observed Nelson in a 1968 Chevrolet automobile pull into the driveway of a residence some distance away from the Hayes residence. Nelson got out of the automobile and began knocking on the door of a residence. The officers inquired as to what he was doing, and he stated that he had had a fight with his wife and wanted to use the telephone. The officers observed a small amount of blood on his shirt. He was advised to get back into his vehicle and move on, which he did. The officers continued on to the Hayes residence, where they found Vice, who was covered with a sheet, lying on the floor and bleeding severely.
After the ambulance arrived and Vice was dispatched to the hospital, the officers went to Thompson's mobile home where they found its contents in disarray and discovered Thompson's nude body lying face down on the bed. The investigation of the scene disclosed blood and a lady's earring on the floor beside the bed in the bedroom of the mobile home; the nude body of the victim, Thompson, lying facedown *Page 230 
on the bed with a bullet wound in the back of his neck; a spent bullet on the floor at the foot of the bed; and a whiskey bottle in the living room. A fingerprint was later lifted from the whiskey bottle.
While on patrol on Highway 41 in Marion County, Tennessee, early in the morning hours of January 2, 1978, Dewey Randall Gamble, a deputy sheriff with the Marion County Sheriff's Department, observed an automobile with an Alabama license plate being driven in an erratic manner. There were two people in the automobile. He stopped the vehicle and arrested the driver for driving under the influence of alcohol. After placing the driver in his patrol car, he approached the vehicle again and learned that Nelson was the passenger. Nelson told the deputy that the vehicle belonged to him, and produced his driver's license at Gamble's request. Gamble asked Nelson to get out of the vehicle, and Nelson refused. Nelson was sitting on the passenger side of the vehicle, and the deputy observed that he was sitting with his left leg over his right knee and his right hand was under his left leg. Gamble had noticed that Nelson had used his left hand to remove his billfold and driver's license and had kept his right hand continuously under his leg. The deputy returned to his patrol car and, using his public address system, ordered Nelson out of the vehicle. After ordering Nelson three times to exit the vehicle, Nelson complied. He was searched, handcuffed, and placed under arrest. An inventory search was made of the vehicle by Gamble and a .38 caliber pistol was discovered under the front seat of the vehicle. A license check revealed that the vehicle belonged to the victim, Thompson. Moreover, Nelson was wearing a belt with the name "Tom" inscribed thereon, and it was later determined that this belt belonged to the victim.
While in custody in Tennessee, Nelson was questioned by an officer from Birmingham. Prior to questioning, he was given proper warnings as required by Miranda v. Arizona,384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He acknowledged that he understood his rights and stated that he wished to talk with the officers. No promises were made to him, and he was not threatened in any way. Nelson made a statement to the officer (which was only used in the instant trial for the purpose of cross-examining appellant since this statement is inconsistent with his trial testimony).
The bullet taken from Vice's thigh and the bullet found on the floor in the bedroom were determined by a firearms expert to have been fired from the .38 caliber pistol seized in Thompson's automobile in Tennessee at the time of Nelson's arrest. Vice identified this pistol as the one which Nelson had obtained in Anniston and had brought to Birmingham. She testified that he carried the pistol at all times and that she never had it in her possession.
Blood samples were taken from Vice, Nelson and the victim and compared with blood found on Nelson's clothing. Vice's blood type was O, Rh factor, positive. Nelson's was O, Rh factor, negative. Thompson's was B, positive. Type O blood was found on Nelson's clothing, but the Rh factor could not be determined.
The autopsy performed on Thompson's body disclosed a near-contact entry wound back of the right side of the neck, three inches backward from the right ear opening. An exit wound was found on the left side of the neck, in front, two inches to the left of the midline. When the bullet passed through the victim's neck, it caused major damage to the spinal cord, terminating the function of all vital organs below the neck and causing death to quickly follow. There were heavy powder burns and soot around the entry wound, which indicated that the pistol had been fired at very close range, possibly within two inches. There was also a separate "tearing" wound of the scalp in the left back of the scalp area. The victim had a .10 percent blood alcohol content.
Nelson, testifying in his own behalf, denied shooting Thompson. He gave the following version of events: About ten to fifteen minutes after arriving at the mobile home, he went to sleep on the couch and, two or three hours later, was awakened by a gunshot. He went into the bedroom and *Page 231 
observed Vice standing nude and holding the .38 caliber pistol. When she pointed the pistol at him, he grabbed for the gun and it accidently went off, shooting Vice in the leg. He then took the gun from her, put it on a table, and reached for a towel to put around Vice's leg. When she grabbed the gun again, he grabbed the barrel of the gun, and as it twisted around, several more shots were fired. Vice was struck by some of the bullets, and he was slightly wounded in the hand. He got the gun away from Vice, put it in Vice's purse, put the purse and gun in Thompson's automobile, and drove away. He stopped at a house about a mile or a mile and a half away to use a telephone to call an ambulance. He was approached and questioned by two deputies before he had a chance to ask to use a telephone. He showed the deputies his driver's license. The deputies told him to get back in the car and leave, and he did.
On cross-examination, Nelson admitted that he never called an ambulance or reported the incident to the police He denied going to the Hayes residence and stated that he did not see Vice leave the mobile home. He testified that he saw Thompson's belt for the first time in the back of Thompson's automobile. He stated that the pistol belonged to Vice and that she carried it in her purse at all times. He claimed that the blood on his clothing came from the wound on his hand. He stated that when he went into the bedroom after being awakened by the gunshot, Thompson was lying on the bed, facing the wall, and there was blood on him. He stated that when the deputies questioned him near the Thompson mobile home, he could have told them that he had had an argument with his wife. He further stated that he could have possibly made statements to the officers in Tennessee which were inconsistent with his testimony concerning the incident, but if he had, he was not under oath at the time and was lying in order to say what the officers wanted him to say so they would return him to Alabama and permit him to see his family.
On further cross-examination, Nelson was asked if, in a prior proceeding, he had made the statement that he overheard Thompson and Vice planning to "do away with him" because he knew about Vice killing a cab driver; that when he went into the bedroom, Thompson was sitting on the bed and Vice was standing with a pistol in her hand; that he struggled with her and Thompson for the pistol; that Thompson and Vice were shot during the struggle; and that he believed they were trying to kill him. (This question refers to the statement made by appellant to the officer in Tennessee, shortly after his arrest, and testified to by appellant in his first trial.) He stated that he could have made the statement, but if he did, he was lying at the time. He insisted, in his trial testimony, that he was asleep on the couch at the time Thompson was shot. Nelson testified that, when he drove away from Thompson's mobile home, he went to the Granada Hotel in Birmingham, where he and Eddie Johnson spent some time drinking. Later he and Johnson drove to Tennessee, where they were arrested. He stated that after removing the pistol, Johnson could have thrown Vice's purse in a dumpster near the hotel.
Sergeant Linn Moore was called as a witness for the defense and testified that he interviewed Vice at 8:07 a.m., and 12:44 p.m., on January 1, 1978, at the hospital. At the time of the interviews, Vice was "visibly shaken" and "wounded." As related by Moore, Vice's statements conflicted, to some extent, with her testimony in the trial and, in some respects, were confusing; however, she insisted at each interview that Nelson shot Thompson and then commenced shooting at her. According to Moore, during these interviews, Vice never mentioned the shooting of a cab driver during these interviews. However, Vice did give a later statement on January 7, 1978, about the shooting of Cash.
James F. Nelson, brother of appellant, testified that appellant was working for him in the construction business in November and December of 1977, and had used "barnyard" red paint. The implication of this testimony was that the stains on appellant's jacket could have been paint. *Page 232 
Appellant raises ten issues on appeal. We will address them in the order in which they appear in appellant's brief.
 I
Appellant states his first contention as follows: "Defendant was denied substantive and procedural due process by the introduction into evidence of an unrelated homicide."
The evidence to which appellant is referring concerned the murder of a cab driver, James Dewey Cash, which occurred in Birmingham approximately four hours prior to the murder of Thompson. The prosecution contended that appellant was involved in the killing and robbing of Cash and that the Cash murder was related to and intertwined with the murder of Thompson. The prosecution theorized that, after robbing and killing Cash, appellant needed an automobile to leave Birmingham so he lured Thompson to the mobile home on a promise of sex with Vice in order to kill him to get his automobile. The State argues, on appeal, that the evidence of Cash's murder was admissible as being part of one continuous transaction and as shedding light on appellant's motive, intent, scienter, and identity. Appellant, on the other hand, argues that the crimes were unrelated and that the admission of evidence concerning the Cash murder was highly prejudicial and constituted reversible error. Over objection of appellant, the details concerning the murder of Cash were admitted into evidence.
The question of the admission of evidence of the Cash shooting initially arose during the cross-examination of appellant. He was asked if he had been asked the following question in a prior proceeding: "Did you observe what Linda and Mr. Thompson were doing or saying there in the trailer," and if he had given the following answer: "I heard Linda say one time that, asked Mr. Thompson about helping her get rid of me because I knew that she had committed a crime and she was afraid I was going to tell on her and turn her in." Appellant answered, "I may have said that, yes sir." The prosecutor then asked, "What crime had she committed that made you afraid?" After objection by appellant to this line of questioning was overruled, appellant denied any participation in the Cash killing. He claimed that Vice told him that she had killed the cab driver, Cash, earlier on New Year's eve. He admitted that he had sat with Cash at a table in the Red Dog Saloon that same night. He further testified, as follows: "I think Linda left with him. I heard she killed him later on. I don't know. I didn't see her. She came back to the bar and said she did." Appellant apparently had made conflicting statements to the officer in Tennessee in reference to the shooting of Cash, and when asked on cross-examination if he had made such statements, he said that he could have, but if he did, he had lied. He was also asked on cross-examination if he told the officer in Tennessee that he was following Cash's taxicab in Thompson's automobile; that Vice was in the taxi; that Vice had the pistol in her purse; that they had not gone far when the taxi suddenly pulled over; that he heard shots; and that Vice had shot Cash. Appellant did not deny making the statement. He stated that he could have made it, but if he did, it was a lie.
Vice was called as a witness by the defense for the apparent purpose of questioning her about her failure to mention the shooting of Cash when questioned by the officers on January 1, 1978. She testified on cross-examination by the State that, earlier on the evening of December 31, 1977, she and appellant met James Dewey Cash, a cab driver, in the Red Dog Saloon. She stated that Cash was going to a party, and he asked appellant and Vice if they wanted to go with him. They agreed, and the three of them left in Cash's taxicab, with Cash driving. All three were sitting on the front seat, with appellant on the right side. After driving a few blocks, appellant told Cash to pull over. After Cash pulled over, appellant pulled out the pistol and told Cash to hand over his money. He then told Vice to get Cash's wallet. Vice got twenty dollars from Cash's pockets and handed the money to appellant. Appellant then tried to take Cash's watch from his wrist, Cash *Page 233 
grabbed the barrel of the pistol, and appellant started firing. Vice testified that he was firing across her, and one bullet hit Cash in the chest, one hit him in the head, and one hit the window. Vice and appellant then exited the cab, and appellant told her that she would have to get him out of Birmingham or he would kill her. Vice told him that she would do anything he wanted her to do. As they were leaving the scene, they met two boys and appellant asked them for directions to the bus station. They went to the bus station where appellant tried to purchase two tickets to Chattanooga, Tennessee. They were told that there would be no bus leaving for Chattanooga until 3:30 the next morning. They went to Theo's Lounge, which apparently was nearby, and observed police cars with their flashing lights going toward the scene of the shooting. Vice testified that she was afraid and that appellant would not let her leave him, even to go to the bathroom; however, she did not try to get away from him. It was in this lounge shortly thereafter that they met Thompson.
Hugh Walter Teate testified for the defense. He stated that he was with appellant and Vice in the Red Dog Saloon on New Year's eve; that he observed a pistol in Vice's purse; that she left with another man; that he learned later before he left the lounge that a cab driver had been shot; that appellant was with him the entire time he was there; and that he left around 11:00 p.m. to midnight. Teate was appellant's friend and had known him seven or eight years. It was shown on cross-examination that he had been convicted of a number of felonies, including several burglaries, grand larceny, violation of the Credit Card Act, robbery, and assault with intent to murder. Teate also testified that he heard Vice threaten appellant by telling him that she would kill him before morning.
In rebuttal, the State called the coroner, J.M. Glass, who testified that he had examined Cash's body. Glass stated that on the right side of Cash's head he found a gunshot wound, which was surrounded by gunpowder, a gunshot wound in the upper right side of his chest, and gunpowder around the hole in Cash's clothing where the bullet penetrated into the chest. It was his opinion that these two bullet wounds caused Cash's death. One bullet was recovered from the victim's head, one from a shoulder, and a piece of a bullet from the chest. Blood samples were also taken. A firearms expert determined that the projectiles taken from Cash's body were three .38 caliber bullets and that they were fired from the same gun that had fired the bullet which had been removed from Vice's leg and the bullet found on the floor in Thompson's mobile home. He further determined that all of the bullets were fired from the pistol seized in Tennessee, at the time of appellant's arrest. It was determined that Cash had Type A, Rh negative blood, and the examination of appellant's jacket disclosed the presence of Type A blood on the cuff of the right sleeve, as well as Type 0 blood.
The general rule is that evidence of other or collateral crimes is not admissible as substantive evidence to establish the guilt of the accused of a particular crime, but as with most broad general rules, numerous exceptions have been developed. Twilley v. State, 472 So.2d 1130 (Ala.Cr.App. 1985);Miller v. State, 405 So.2d 41 (Ala.Cr.App. 1981); Thompson v.State, 374 So.2d 377 (Ala.Cr.App. 1978), aff'd, 374 So.2d 388
(Ala. 1979); McMurtrey v. State, 37 Ala. App. 656, 74 So.2d 528
(1954); Wilkins v. State, 29 Ala. App. 349, 197 So. 75, cert. denied, 240 Ala. 52, 197 So. 81 (1940); C. Gamble, McElroy'sAlabama Evidence, §§ 69.01(1)-(11) (3d ed. 1977). These exceptions to the general rule fall under the following general divisions: (1) Relevancy to prove physical capacity, skill, or means to commit the now-charged crime; (2) part of the resgestae or part of a continuous transaction; (3) relevancy to prove scienter or guilty knowledge; (4) relevancy to prove criminal intent; (5) relevancy to prove plan, design, scheme, or system; (6) relevancy to prove motive; (7) relevancy to prove identity; (8) relevancy to rebut special defenses; and (9) relevancy in various particular crimes. Wilkins v. State, supra; McElroy's, supra. While the general rule is that evidence of separate crimes is inadmissible *Page 234 
where the only probative function of such evidence is to show bad character or an inclination or propensity to commit the type of crime for which the accused is being tried, if the accused's commission of another crime or misdeed is an element of guilt or otherwise tends to prove his guilt, then proof of such other crime or misdeed is admissible. Twilley v. State, supra; Watson v. State, 398 So.2d 320 (Ala.Cr.App. 1980), cert. denied, 398 So.2d 332 (Ala.), cert. denied, 452 U.S. 941,101 S.Ct. 3085, 69 L.Ed.2d 955 (1981); McElroy's, § 69.01(1). Moreover, if the accused's commission of another crime is admissible in a present prosecution, the State may prove in meticulous detail the manner in which the accused committed such other crime. Weatherford v. State, 369 So.2d 863
(Ala.Cr.App.), cert. denied, 369 So.2d 873 (Ala.), cert. denied, 444 U.S. 867, 100 S.Ct. 141, 62 L.Ed.2d 91 (1979);McElroy's, § 69.02(8).
Prior to the trial court's ruling on the admissibility of evidence of the killing of Cash, a lengthy discussion occurred between the trial judge, prosecuting attorney, and defense counsel. We find it helpful in understanding this issue to set out a portion of the discussion, which is as follows:
 "MR. DAVIS (prosecuting attorney): I will just repeat some of what I said earlier. I believe the time frame will prove to be about 10:30 at night, the first shooting involving Mr. Cash in the taxi cab. I believe the facts will show that the Defendant and Linda Vice got into the cab with Mr. Cash and, according to our testimony anyway, a robbery occurred and that after the robbery occurred, the Defendant shot the cab driver and he forced Linda Vice to run with him to Theo's Grill, where they stayed several hours watching the police cars go by, hiding in there. He had no transportation at that point, and they picked up Wilson Thompson and the Defendant convinced him to go out to his place to what he thought was going to be an orgy. Once they were there, the Defendant shot Wilson Thompson and Linda Vice. We would argue first of all, that this comes under an exception —
"THE COURT: For transportation?
 "MR. DAVIS: To get away and also robbery. I think it is a part of the continuing scheme or transaction of events that was so intermixed, you leave the jury with only a half a view of what happened, and very much confused. I would also note that there has been some testimony by the Defendant that the shooting of Linda Vice was an accident and I think there is an exception under Johnson v. State, 390 So.2d, which shows evidence of another crime is admissible to disprove a claim of an accident. It is also admissible in that instance to show the intent of the Defendant at that time, not only in shooting Linda Vice, but also shooting Wilson Thompson.
 Also, courts have allowed in homicide prosecutions, other crimes or the introduction of evidence of other crimes to show the motive is closely related in time if dangerous or potentially a motive on the part of the defendant for doing the shooting. I believe we've got three or four different exceptions: plan, scheme or design, motive, and dangerous mood as in Simpson v. State. Likewise, there is a chain connecting all of these events. We've got the same pistol that was used in killing Dewey Cash, used to kill Wilson Thompson a little bit later on in the night.
 I believe we didn't introduce evidence of it, but we have evidence which shows blood of the same type, A positive blood or A-type blood from the Defendant's clothing, and A-type blood was the blood type of Dewey Cash.
There are any number of chains and facts —
 "THE COURT: Is it the contention of the State that the Defendant and Miss Vice lured Mr. Thompson out there with the false promise of sex and that the purpose was to —
 "MR. GOMANY (prosecuting attorney): No, sir. Not on the part of Linda Vice.
 "THE COURT: All right. The Defendant with the false statement that there would be sex and the real purpose was to *Page 235 
get away? Is that your contention? You just said it was.
"MR. DAVIS: That would be my contention.
 "MR. GOMANY: Also predicated on the fact that David Larry Nelson puts it in her possession.
 "THE COURT: It is also part of it to show a reason for getting Mr. Thompson was to get away from the first killing? Transportation?
"MR. GOMANY: Reasonable inference.
"THE COURT: Transportation out of the city?
 "MR. DAVIS: Yes, sir. And especially since he went to Tennessee in Mr. Thompson's car.
 "THE COURT: I think, Mr. Dawson, [defense counsel] this is just continuous and to let the jury have half of it would be misleading.
". . . .
 "THE COURT: . . . [I]t is an unbroken chain of events."
In its oral charge, the trial court instructed the jury on how they should treat the evidence of the Cash killing, as follows:
 "There was evidence that a man by the name of Cash also met his death a short time prior to Mr. Thompson. When I say that, I'm not saying that is a fact. I'm just saying there was evidence of it. And that evidence is for your consideration only for this purpose: Again, he is being tried for killing Wilson W. Thompson. The evidence of December 31st, 1977 is not put in there to show that the Defendant has bad character or to show that he has a propensity. If you believe that he did, then you may reject that testimony or you may accept it. It is put in for the sole limited purpose of whatever consideration to the intent, to the question of intent to kill Wilson W. Thompson. That is, it is for that specific purpose, or the question of intent. You should not take that, or you may reject it. You may feel as though that evidence is not to be believed, that evidence does not shed any light on this charge alleged in the indictment. It is not put there to show the Defendant's bad character or to show a propensity. It is offered to you for the specific purpose on the question of intent to kill Wilson W. Thompson. You may reject it, you may accept it, but it is for that specific purpose only. You may reject it totally. That is for this jury to determine. It is a fact in this case which is offered in this trial on a particular point which may be accepted or rejected by you according to your sound discretion, as any fact that has been offered in this case, for that very same purpose."
One well-recognized exception to the general exclusionary rule pertaining to collateral crimes is relevancy to prove intent. The State may prove a defendant's commission of another crime if an issue exists as to whether the accused killed the deceased intentionally or accidentally, and the accused's commission of such other crime tends to show that the defendant killed the deceased intentionally. Pattillo v. State, 245 Ala. 192, 16 So.2d 303 (1944); Vincent v. State, 231 Ala. 657,165 So. 844 (1936). This rule is based upon the theory that, because the unintentional doing of an act is abnormal and unusual, the more a person does other acts similar to the act in question, the greater the likelihood that the act in question was not done inadvertently. McElroy's § 69.01(5). At 2 Wigmore, Evidence § 362 (Chadbourne Rev. 1979), as quoted inJohnson v. State, 390 So.2d 1160, 1166-67 (Ala.Cr.App.), cert. denied, 390 So.2d 1168 (Ala. 1980), the following discussion of the proof of intent is found:
 "The intent principle . . . receives constant application; for in homicide the intent to kill is practically always in issue. It is to be proved by the prosecution, and the recurrence of other acts of the sort tends to negative inadvertence, defensive purpose, or any other form of innocent intent. For this purpose, therefore, the evidence is receivable irrespective of whether the act charged is itself conceded or not. . . . As to the similarity of the other acts, no fixed rule can be formulated. They certainly need not have been done to the same person; they need not have accompanied more or less immediately *Page 236 
the act charged, and they may have been done even at a subsequent time. The precedents show every variety of circumstances, and a correct application of the principle would receive any evidence of the sort which conveys any real probative indication of the defendant's intent. (Footnotes omitted.)"
Another exception is relevancy to prove motive. The motive element for a homicide may take many forms; it may include the purpose of the homicide. McElroy's § 70.01(12)(e). Whenever a crime or subsequent crime is relevant to prove the motive for the now-charged homicide, it is admissible. Id. The State may prove the accused's commission of a previous crime if the evidence warrants a reasonable inference that he committed the now-charged homicide for the purpose of escaping arrest and conviction for the previous crime. Hodge v. State, 199 Ala. 318,74 So. 373 (1917); Miller v. State, 130 Ala. 1, 30 So. 379
(1901); McElroy's, § 70.01(12)(e).
We conclude, after carefully examining the evidence in the record of this case, that the evidence of the Cash killing was properly admitted as bearing on appellant's intent at the time of the shooting of Thompson. The self-contradictory statements made by appellant to police officers in Tennessee claiming that Thompson and Vice were shot accidentally while appellant was trying to take the pistol from Vice, even though appellant claimed at trial that they were untrue and that Vice actually shot Thompson, were admissions of appellant, and, hence, substantive evidence against him; the evidential weight of such evidence was for the jury. Hill v. State, 194 Ala. 11,69 So. 941 (1915); Bailey v. State, 41 Ala. App. 39, 123 So.2d 304, cert. denied, 271 Ala. 696, 123 So.2d 310 (1960). The evidence of the Cash killing, which occurred approximately four hours prior to the Thompson killing, was quite relevant to the question of whether appellant intentionally killed Thompson or whether Thompson was accidently killed while appellant and Vice struggled over the pistol. The self-contradictory statements of appellant to the effect that Thompson was shot accidentally made the question of appellant's intent in the shooting of Thompson very much an issue.
We further conclude that the admission of the evidence of the Cash killing was also justified as a circumstance tending to show motive for the killing of Thompson. Considering the evidence that appellant had robbed and murdered Cash four hours earlier, had made statements that it was necessary to get out of town, had threatened to kill Vice if she did not help him, had gone immediately after the Cash killing to the bus station and made an effort to get bus tickets to Tennessee, had found that no bus would be available for that purpose for several hours, had gone to a nightclub nearby, had observed police cars and flashing lights apparently going to the scene of the Cash slaying, and had refused to let Vice out of his presence even to go to the bathroom, it is reasonable to conclude that he enticed Thompson to take them to Thompson's mobile home thirty miles outside Birmingham on a promise of sex in order to kill him to obtain his automobile and effect his escape. The evidence of the Cash killing warrants a reasonable inference that the killing of Thompson was for the purpose of obtaining the means of escape to avoid detection, arrest, and ultimate prosecution for the killing of Cash. The evidence of the killing of Cash could reasonably reflect a desire to escape and thus shed light on the motive for the murder of Thompson. SeeHarmon v. State, 47 Ala. App. 576, 258 So.2d 917 (1972).
For these reasons, we find that the evidence of the killing of Cash was properly admitted. We note that the trial court made a finding of fact in the sentencing phase of the trial that appellant's purpose of enticing Thompson to the trailer park in Kimberly was to obtain Thompson's automobile so that he could leave the state. We are in full accord with this finding. It is amply supported by the record.
 II
Appellant next contends that the failure of the State to provide funds for investigation or expert witnesses deprived *Page 237 
him of a fair trial and violated his due process rights.
The record shows that appellant filed the following motions: Motion for funds to hire investigators, motion for funds for expert witnesses, and motion for psychiatric evaluation. All were denied by the trial court after hearings. These motions were initially filed, and the hearings held, prior to the first trial in 1978. At the second trial in 1982, they were refiled and submitted to the trial court on the record made at the first trial. This portion of the record of the first trial has been incorporated in the record of this trial by agreement.
It has been repeatedly held by our courts that a denial of funds to pay defense experts for investigations and other assistance does not amount to a deprivation of constitutional rights. Dutton v. State, 434 So.2d 853 (Ala.Cr.App. 1983);Thigpen v. State, 372 So.2d 385 (Ala.Cr.App.), cert. denied,372 So.2d 387 (Ala. 1979), cert. denied, 444 U.S. 1026,100 S.Ct. 690, 62 L.Ed.2d 660 (1980). We have held that this includes psychiatric specialists. Tillis v. State, 292 Ala. 521, 296 So.2d 892 (1974); Dutton v. State, supra. A defendant has no right to receive a mental examination to determine his sanity at State expense whenever he requests one; absent such a right, the trial court is the proper screening agent as to such. Willis v. State, 441 So.2d 1030 (Ala.Cr.App. 1983);Dutton v. State, supra; Allums v. State, 368 So.2d 313
(Ala.Cr.App. 1979); Robinson v. State, 337 So.2d 1382
(Ala.Cr.App. 1976).
Section 15-12-21(d), Code of Alabama 1975, provides for reimbursement for reasonable expenses incurred in the preparation of an indigent accused's defense; however, the expenses must be approved in advance by the trial judge.
In Ex parte Clisby, 456 So.2d 95, 97-98 (Ala. 1983), on remand Clisby v. State, 456 So.2d 98, appeal after remand,456 So.2d 99, aff'd, 456 So.2d 105, cert. denied, 470 U.S. 1009,105 S.Ct. 1372, 84 L.Ed.2d 391 (1983), our supreme court held:
 "[T]he indigent defendant in a criminal case does not enjoy a constitutional right to have the aid of the State by the appointment of an expert for his exclusive benefit. Thigpen v. State, 372 So.2d 385 (Ala.Cr.App.), cert. denied, 372 So.2d 387
(Ala. 1979), cert. denied, 444 U.S. 1206
[100 S.Ct. 690, 62 L.Ed.2d 660] . . . (1980). The defendant may have that right where necessary for an adequate defense. Anno., 34 A.L.R.3d 1256 (1970). However, 'there exists no constitutional right to the appointment of a private psychiatrist of the defendant's own choosing at public expense.' Satterfield v. Zahradnick, 572 F.2d 443 (4th Cir.), cert. denied, 436 U.S. 920 [98 S.Ct. 2270, 56 L.Ed.2d 762] . . . (1978)."
See Harrell v. State, 470 So.2d 1303 (Ala.Cr.App. 1984), aff'd,470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935,106 S.Ct. 269, 88 L.Ed.2d 276 (1985).
The United States Supreme Court held recently in the case ofAke v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53
(1985):
 "We therefore hold that when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense. This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own. Our concern is that the indigent defendant have access to a competent psychiatrist for the purpose we have discussed, and as in the case of the provision of counsel we leave to the State the decision on how to implement this right."
In the instant case, it is clear that appellant was not entitled to employ experts and investigators at State expense. He made no showing of a particularized need or that such assistance was necessary for an adequate defense. The evidence and arguments in support of the motions amounted to no more than an assertion that it would be desirable or helpful to have an investigator to check the work of the police. Appellant *Page 238 
argued, at the time the motion was originally heard, that he needed an investigator to interview the many State witnesses. After this argument was made, the first trial was held and the resulting conviction reversed. At the second trial, appellant could not be heard to complain about not having interviewed all the State's witnesses since he had heard them all testify in the first trial. Moreover, the fact that appellant was well informed about the State's evidence and theory of its case is all the more reason for requiring him to show a particular need for experts and investigators, which he did not do.
Prior to the first trial, appellant was examined at State expense by Dr. Brantley Emmett Blankenship, a psychiatrist employed by the University of Alabama School of Medicine in the Department of Psychiatry and by Jefferson County. Dr. Brantley's employment with the County involved conducting psychiatric examinations and making evaluations to determine mental conditions of certain persons and deciding whether further evaluation was necessary. He performed this service for several county agencies, and particularly examined defendants in criminal cases and inmates in the jail when requested to do so. His qualifications were admitted. Dr. Blankenship's examination of appellant disclosed the following: "[N]o evidence of any mental disease process at all. . . . No evidence of psychosis at all. Not enough to even warrant further investigation." He testified that it was not probable that appellant had had a mental disease or condition in the past.
Appellant at no time entered a plea of not guilty by reason of insanity. He offered no evidence of insanity at either trial or during any proceedings. He made no preliminary showing that his sanity at the time of the offense was likely to be a significant factor at trial, and thus, the rule established inAke v. Oklahoma, supra, does not apply here. Insanity was never made an issue.
In the absence of any evidence, the mere allegations by counsel that the accused is incompetent to stand trial or was insane at the time of the commission of the offense do not establish reasonable grounds to doubt a defendant's sanity which would warrant an inquiry into his competency. Whorton v.State, 422 So.2d 812 (Ala.Cr.App. 1982). All we have are the mere allegations of counsel. There is nothing in the record to suggest some reason to doubt appellant's competency or sanity either at the time of the commission of the offense or at the time of trial. With the consent of the trial court and his counsel, appellant took an active part in his representation at his trials. He participated in arguments before the court and the jury, cross-examined witnesses, made objections to evidence, and testified in his own behalf. Some of his arguments and objections to evidence disclose a marked understanding of the proceedings and considerable intelligence. We addressed this identical issue in Nelson v. State,405 So.2d 392 (Ala.Cr.App. 1980), rev'd on other grounds, 405 So.2d 401
(Ala. 1981) (appeal from conviction for the murder of Cash), and again in Nelson v. State, 452 So.2d 1367 (Ala.Cr.App.), cert. denied, 452 So.2d 1367 (Ala. 1984) (appeal from second conviction for murder of Cash), and held adversely to appellant's contentions. We reaffirm our holding in those cases in reference to this issue.
The determination of whether a reasonable doubt of sanity exists is a matter within the sound discretion of the trial court and may be raised on appeal only upon a showing of an abuse of discretion. Livingston v. State, 419 So.2d 270
(Ala.Cr.App. 1982). Likewise, whether the defendant has made a sufficient preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial is within the discretion of the trial court, and the trial court's decision will not be disturbed in the absence of abuse of that discretion. Holmes v. State, 497 So.2d 1149 (Ala.Cr.App. 1986);Campbell v. State, 484 So.2d 1168 (Ala.Cr.App. 1985).
We find no abuse here in the trial court's discretion in denying the motions. *Page 239 
 III
Appellant contends that his constitutional rights were denied by the failure of the State to provide him a preliminary hearing or an adequate hearing on his habeas corpus petition.
We previously addressed this identical issue on the appeal of appellant's first conviction for the robbery and murder of Cash. Nelson v. State, 405 So.2d 392 (Ala.Cr.App. 1980), rev'd on other grounds, 405 So.2d 401 (Ala.), on remand,405 So.2d 401 (Ala.Cr.App. 1981). Initially, as we have previously noted, appellant was charged in one indictment for the capital offense of first degree murder wherein two or more human beings are intentionally killed by the defendant by one or a series of acts. Later, he was charged under the Alabama Death Penalty Act in separate indictments for the two homicides. Much of the preliminary matters involving both cases, including pretrial motions and evidentiary hearings, was consolidated by agreement and is common to both cases. The pre-trial motions and the two preliminary evidentiary hearings of the first Cash trial are included by agreement as part of the transcript in the instant case.
We held in the appeal of the first conviction for the robbery-murder of Cash, Nelson, 405 So.2d at 395, that there is no constitutional right to a preliminary hearing in Alabama, Exparte Flanigan, 278 Ala. 432, 178 So.2d 825 (1965), and that a preliminary hearing is not necessary to satisfy the requirements of due process. Scaife v. State, 337 So.2d 146
(Ala.Cr.App. 1976); Trammell v. State, 43 Ala. App. 308,189 So.2d 760, cert. stricken, 280 Ala. 31, 189 So.2d 763 (1966). We found that the obvious purpose of the request for a preliminary hearing and the habeas corpus hearing was discovery. 405 So.2d at 396. We further held that in view of the fact that one habeas corpus hearing had been held, at which defense counsel had been permitted to subpoena witnesses, and in view of the liberal discovery ordered by the trial judge plus the fact that the defendant had never contended or shown that he had any statutory right to a preliminary hearing, we could not say that the trial judge erred in refusing to grant a second habeas corpus hearing. Id. Our holding is applicable to the case at bar, and we reaffirm it and adopt it as our decision in this case insofar as this contention of appellant is concerned. Thus, we find no merit in this contention.
 IV
Appellant argues that the section of the Alabama Death Penalty Act, § 13-11-2(a)(13), which authorizes capital punishment for any murder committed by a defendant who has been convicted of murder in the first or second degree in the twenty years preceding the crime, is in violation of the Equal Protection and Due Process Clauses of the Fifth, Sixth and Fourteenth Amendments, and that the section violates his due process rights by requiring the prior conviction to be included in the indictment. In determining the validity of appellant's contentions, we rely on Hubbard v. State, 382 So.2d 577, 588-91
(Ala.Cr.App. 1979), aff'd, 382 So.2d 597 (Ala. 1980), rev'd,405 So.2d 695 (Ala.Cr.App. 1981), and Hubbard v. State,500 So.2d 1204 (Ala.Cr.App. 1986), wherein we fully addressed these issues and held that the statute does not violate the Fifth and Sixth Amendments. Based on the reasoning and holding in theHubbard cases further discussion is not necessary here.
 V
Appellant contends that he was denied a fair trial due to the failure of the trial court to provide expert psychiatric testimony. We have previously determined, in part III of this opinion, that this contention is without merit. Further discussion is unnecessary.
 VI
Appellant next contends that the trial court erred to reversal when it refused to charge the jury on the law pertaining to intoxication and provocation as it relates to homicide.
Appellant submitted written requested instructions relating to intoxication and *Page 240 
provocation. Charges 9 and 10 pertained to provocation, and 11 through 16 concerned intoxication. The trial court refused to give any of the requested written instructions. It gave no reason for refusing the provocation charges. As to the intoxication charges, it stated that, among other things, it was refusing them because the defense was that appellant was asleep at the time of the shooting and, because there was no evidence upon which to base them. When considering the charges, the trial court said, "These charges only include where you actually kill somebody while you are drunk."
All of the charges are improperly drawn; they are not predicated on the facts of the case, are abstract statements of law, are incomplete and confusing, and, in the case of charge 13, clearly not applicable to this case. The trial court's refusal to give the charges was proper. Free v. State,495 So.2d 1147 (Ala.Cr.App. 1986); Thompson v. State, 369 So.2d 50
(Ala.Cr.App.), cert. denied, 369 So.2d 52 (Ala. 1979); Hudsonv. State, 335 So.2d 208 (Ala.Cr.App.), cert. denied,335 So.2d 211 (Ala. 1976). See generally, Ala. Digest, Criminal Law, § 770, et. seq.
While we find that the charges were defective and, thus, it was proper for the trial court to refuse them, nevertheless, this being a death case, we must examine the proceedings and notice any plain error which has, or probably has, adversely affected the substantial rights of appellant. Rule 45A, A.R.A.P. Under the facts of this case, did the trial court's failure to include instructions pertaining to intoxication and provocation in its oral charge constitute plain error?
Every accused is entitled to the giving of charges which would not be misleading, which correctly state the law of his case, and which are supported by any evidence, however weak, insufficient, or doubtful in credibility. Chavers v. State,361 So.2d 1106 (Ala. 1978); Burns v. State, 229 Ala. 68,155 So. 561 (1934). In charging the jury, it is incumbent on the trial court to give the law applicable to all theories presented by the evidence. Stork v. State, 475 So.2d 623 (Ala. 1985); McGeev. State, 383 So.2d 205 (Ala. 1980); Johnson v.State, 257 Ala. 644, 60 So.2d 818 (1952); Shields v. State,52 Ala. App. 690, 296 So.2d 786, cert. denied, 292 Ala. 749,296 So.2d 793 (1974); Glover v. State, 21 Ala. App. 423, 109 So. 125
(1926).
Provocation has been defined as that treatment by another which arouses anger or passion, which produces in the minds of persons ordinarily constituted the highest degree of exasperation, rage, anger, sudden resentment, or terror.Johnson v. State, 129 Wis. 146, 108 N.W. 55 (1906). Provocation is peculiar to homicide cases. Malice, express or implied, distinguishes murder from manslaughter; and a sudden transport of passion, caused by adequate provocation, if it suspends the exercise of judgment, and dominates volition, so as to exclude premeditation and a previously formed design, although it does not entirely dethrone reason, is sufficient to reduce the killing to manslaughter. Davis v. State, 214 Ala. 273,107 So. 737 (1926), overruled in part on other grounds, Smith v. State,230 Ala. 18, 158 So. 808 (1935); Smith v. State, 83 Ala. 26,3 So. 551 (1887).
While provocation must be of a nature calculated to influence the passions of the ordinary reasonable man, the courts have reached different conclusions as to what factual situations are embraced within the doctrine. The trial court must, as a preliminary question, decide as a matter of law whether offered evidence of provocation has any tendency to prove mitigating circumstances; when so construed and admitted, the questions of sufficient provocation and cooling time are then solely for the jury. Commentary to § 13A-6-3, Code of Alabama 1975.
In the instant case, appellant did not assert a defense of provocation at trial, nor did he argue provocation to the jury. His testimony at trial was devoid of any evidence of provocation; it contained nothing from which provocation could be inferred. His entire argument in brief on this subject is, as follows: "[T]he testimony of prior arguments and threats between Defendant and Ms. Vice and the sudden sexual encounter *Page 241 
with Thompson are relevant to the issue of provocation." We fail to see how any arguments and threats occurring between appellant and Vice would tend to support a claim of provocation for appellant to kill Thompson. As shown in the record, the discussions between Vice and appellant prior to the shooting of Thompson can hardly be called arguments, and the only evidence of threats was appellant telling Vice earlier in the evening after he had shot Cash that if she did not help him get out of Birmingham, he would kill her, and the statement of Teate that, while in Theo's lounge, he heard Vice threaten to kill appellant. This testimony, in no way, presents a theory of provocation to kill Thompson. Likewise, we fail to see any basis for a theory of provocation in the sexual activities described in the record, for the only evidence describing these activities shows that appellant, in all ways, encouraged, directed, and consented to Vice's sexual activities. There is simply no evidence of provocation here. There was no evidence to present a theory of provocation which would require the trial court to charge on the subject in its oral charge.
The general rule as to the effect of voluntary intoxication in homicide cases is stated in Helms v. State, 254 Ala. 14, 19,47 So.2d 276, 281 (1950), as follows:
 "Voluntary drunkenness neither excuses nor palliates crime. But in murder cases evidence of drunkenness to such degree that the accused is incapable of rational action and hence incapable of forming a specific intent essential to a malicious killing may reduce the killing to manslaughter, or may negative the premeditation and deliberation essential to murder in the first degree, or reduce the crime to murder in the second degree. Ivory v. State, 237 Ala. 344, 186 So. 460; King v. State, 90 Ala. 612, 616, 8 So. 856."
See also Gosa v. State, 273 Ala. 346, 139 So.2d 321 (1962); Rayv. State, 257 Ala. 418, 59 So.2d 582 (1952); Foust v. State,414 So.2d 485 (Ala.Cr.App. 1982); Martin v. State, 56 Ala. App. 33, 318 So.2d 772, cert. denied, 294 Ala. 765, 318 So.2d 775
(1975); Rogers v. State, 49 Ala. App. 78, 268 So.2d 859 (1972); 21 Am.Jur.2d Criminal Law §§ 54, 55 (1981); 1 Wharton'sCriminal Evidence § 223 (C. Torcia 13th ed. 1972). Drunkenness on the part of a defendant, at the time of the commission of a homicide, may reduce the offense from murder to manslaughter, if shown to be so excessive as to render him incapable of entertaining or forming the design to take life — that is, incapable of rational action; and when there is any evidence showing that he was drunk at the time, he has the right to have the jury decide as to its degree and effect. King v. State,90 Ala. 612, 8 So. 856 (1891).
If the evidence shows that appellant was drunk at the time of the homicide, he had a right to have the jury instructed as to the law in such case, and to have them pass upon the sufficiency of the evidence to prove that his drunkenness was so excessive as to preclude the entertainment of malice. A refusal to give a charge, though it may state a correct legal proposition, is not a reversible error, unless it affirmatively appears there was evidence tending to prove every fact it supposes. King, supra.
After careful consideration of the record in this case, we find that there was no evidence that appellant was drunk or intoxicated when Thompson was shot. It is true that there was testimony that appellant and Vice had been "drinking" and possibly taking some kind of drugs during the several days preceding the killing. There is also testimony that appellant, Vice, and Thompson were "drinking" in Theo's lounge earlier in the evening preceding the killing. Vice testified that she and appellant had a beer and a hotdog at Theo's lounge. It also appears that appellant, Vice, and Thompson took a "drink" from a bottle on the way to Thompson's trailer. When they arrived at the trailer, Thompson fixed a drink for each of them. Appellant testified that within ten to fifteen minutes after arriving at the trailer, he went to sleep on the living room couch. He stated that he slept for two to three hours and was awakened by a noise. He then discovered that Thompson had been shot and Vice was standing over him with a pistol. On cross-examination, appellant was asked, *Page 242 
"Where were you when Mr. Thompson was shot?" He answered, "I was lying on the couch asleep." He was then asked, "Were you intoxicated at that time?" He answered, as follows: "I wasn't exactly what you would say intoxicated at that time. When we first got out there, I was at the intoxicated stage. I had been drinking." Shortly after appellant left Thompson's trailer, he was accosted by the two officers, who were responding to the call to come to the Hayes residence. After questioning appellant, the officers ordered him to get in his car and leave. It is reasonable to assume that had appellant been intoxicated, the officers would not have permitted him to drive away in the vehicle.
At no time during the trial of this case did appellant contend that he was intoxicated at the time of the shooting. In fact, his own statement is that he was not intoxicated. There is no evidence in the record from which one could infer that appellant was intoxicated or drunk at the time Thompson was killed. He made no issue of his sobriety at any time during the proceedings. The theory of his defense was alibi. He was asleep. His contradictory statement to the officer in Tennessee, which was elicited on cross-examination, raised no question of his sobriety and was consistent with a defense of accident.
Here, there was no evidence upon which to base a charge on the law of drunkenness or intoxication. There was simply no evidence to support a theory of intoxication. The trial court committed no error in refusing the charges, and in omitting instructions on intoxication from its oral charge.
 VII
Appellant contends that portions of the prosecuting attorney's arguments to the jury during the guilt and sentencing phases were so prejudicial that he was denied a fair trial. He complains of a number of allegedly objectionable statements made by the State's attorney during closing arguments, and, also, argues that the cumulative effect of the prosecutor's remarks created reversible error.
In closing argument, counsel may argue every matter of legitimate inference and may examine, collate, sift, and treat the evidence in his own way. Mathis v. State, 414 So.2d 151
(Ala.Cr.App. 1982). Counsel has wide latitude to draw reasonable inferences from the evidence. Hollis v. State,399 So.2d 935 (Ala.Cr.App. 1981); Brown v. State, 374 So.2d 391
(Ala.Cr.App.), aff'd, 374 So.2d 395 (Ala. 1979). Wide latitude is given to the district attorney in making reply to an argument previously made by a defense counsel. Evans v. State,338 So.2d 1033 (Ala.Cr.App. 1976), cert. denied, 348 So.2d 784
(Ala. 1977).
We have carefully reviewed every allegation of error and, in addition, have read the arguments in their entirety in search of error and find none that require reversal. We have also considered the cumulative effect of the comments complained of and find no error prejudicial to appellant.
In reviewing the allegations of error, we find that some of defense counsel's objections were not well taken and, in the case of others, the trial court properly sustained the objections, instructed the jury to disregard the comments, or dissipated any prejudicial effect by instructions. In some cases, the prosecutor's remarks were proper as they were reasonable inferences to be drawn from the evidence or were responses in kind to arguments made by defense counsel.
While we do not necessarily approve of all of the prosecuting attorney's arguments, we do not find that the portions complained of or the arguments as a whole were so prejudicial that they denied appellant a fair trial.
 VIII
Appellant states this contention, as follows: "DEFENDANT SHOULD NOT HAVE BEEN TRIED AGAIN UNDER THE DEATH PENALTY LAW, AS SUCH HAD BEEN RULED UNCONSTITUTIONAL, AND AS SUCH, COULD NOT BE RESURRECTED BY A COURT OPINION SUGGESTING LESSER INCLUDED OFFENSES." *Page 243 
Appellant argues that, after his original conviction was reversed pursuant to Beck v. Alabama, 447 U.S. 625,100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), "further prosecution seeking death should have been prohibited." This argument is foreclosed byBeck v. State, 396 So.2d 645, 660 (Ala. 1980).
Appellant states that "[h]aving escaped that option previously, the more severe punishment should not have been available on retrial." If this is a claim that appellant was originally sentenced to life without parole, but on retrial was sentenced to death, it is incorrect.
 IX
Appellant contends that the overall operation of the 1975 Alabama capital murder statute — as it was applied in his case — is unconstitutional. First, he complains that the jury in his case was only instructed on capital murder and the lesser included offenses of first and second degree manslaughter and, thus, the jury was not given the option of returning a verdict of either first degree murder or second degree murder. This instruction was proper. Appellant was charged under Code of Alabama 1975, § 13-11-2(a)(13), which defines as a capital offense: "Any murder committed by a defendant who has been convicted of murder in the first or second degree in the 20 years preceding the crime. . . ." In this case, the evidence of the aggravation — a prior conviction of second degree murder — was undisputed; the conviction was admitted by appellant. If the jury found that the present offense by appellant was murder in either degree, it had to convict him of the capital offense because of the admitted prior murder conviction. Due process requires that a lesser included offense instruction be given only when the evidence warrants such an instruction. Hopper v.Evans, 456 U.S. 605, 611, 102 S.Ct. 2049, 2052-53,72 L.Ed.2d 367 (1982). Indeed, the giving of an instruction on a lesser included offense is impermissible absent evidence supporting a conviction of the lesser offense. Id. See also Wright v. State,494 So.2d 726 (Ala.Cr.App. 1985), aff'd, 494 So.2d 745 (Ala. 1986). The trial court's refusal to charge the jury on first and second degree murder as lesser included offenses was correct.
Appellant argues further that the sentencing by the trial court is weighted in favor of death where the jury has entered an advisory sentence verdict of death. Under Code of Alabama 1975, § 13-11-4, the trial court must independently weigh the aggravating and mitigating circumstances and may impose a death sentence only if the aggravating circumstances outweigh the mitigating circumstances. Appellant's argument is thus based upon the premise that the trial courts of Alabama will ignore their statutory duty. We reject this argument.
Moreover, no argument can be made that the trial court in this case ignored its duty. The evidence supports the trial court's finding of the existence of two aggravating circumstances and no mitigating circumstances. Thus, it cannot be reasonably argued that the trial court was improperly influenced by the jury's recommendation of death.
Appellant also argues that the Alabama appellate courts "are unable to adequately rectify the imbalance the death statute perpetrates" because they are unable to comparatively review death sentences. Appellant does not specify why the Alabama appellate courts are unable to conduct this review. In answering the argument, we direct appellant's attention to the following discussion in Wright, 494 So.2d at 742-43:
 "Contrary to the defendant's argument, appellate review of a death sentence under the 1975 Act is constitutionally adequate. Although the 1975 Act contained no specific provisions for proportionality review, the Eighth Amendment to the United States Constitution does not require a state appellate court to compare a defendant's death sentence with sentences imposed in similar cases to determine if the death sentence was proportionate. Pulley v. Harris, 465 U.S. 37, [104 S.Ct. 871, 79 L.Ed.2d 29] . . . (1984). Additionally, Beck v. State, 396 So.2d 645, 664
(Ala. 1981), which we apply in reviewing the defendant's appeal requires *Page 244 
appellate courts to examine all death sentences in light of the standard and procedure approved in Gregg v. Georgia, 428 U.S. 153 [96 S.Ct. 2909, 49 L.Ed.2d 859] . . . (1976), and ascertain 'whether the crime was in fact one properly punishable by death, whether similar crimes throughout the state are being punished capitally and whether the sentence of death is appropriate in relation to the particular defendant.' Beck, 396 So.2d at 664.
 "Any infirmity in the 1975 Act with regard to appellate review is cured by actually providing the defendant with a proportionality review of his sentence on this appeal of his conviction." (Emphasis in original.)
 X
Appellant's contention that the death penalty statute is in contravention of the Eighth Amendment because it does not provide for comparative review of sentences has also been foreclosed by the above-quoted holding in Wright, 494 So.2d at 742-43.
 XI
The scope of our review in death cases is prescribed in A.R.A.P., 45A, as follows:
 "In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
In the instant case, we have followed this standard of review and have found no plain error or defect in either the guilt phase or sentencing phase of the proceedings.
We have also followed the requirements of Beck v. State, supra. In reviewing Nelson's death sentence by the three-tiered analysis of Beck v. State, we make the following findings: First, appellant, Nelson, was convicted of murder in the first degree after having been previously convicted of murder in the second degree within twenty years of said crime, in violation of § 13-11-2(a)(13), Code of Alabama 1975. This offense is, by statutory definition and designation, a capital offense. Second, we take judicial notice that similar crimes are being punished capitally throughout this state. See, e.g., Hubbard v.State, 500 So.2d 1204 (Ala.Cr.App. 1986); Arthur v. State,472 So.2d 650 (Ala.Cr.App. 1984), rev'd and remanded on other grounds, 472 So.2d 665 (Ala.), on remand, 472 So.2d 670
(Ala.Cr.App. 1985); Jackson v. State, 459 So.2d 963
(Ala.Cr.App.), aff'd, 459 So.2d 969 (Ala. 1984), cert. denied,470 U.S. 1034, 105 S.Ct. 1413, 84 L.Ed.2d 796 (1985). See alsoJulius v. State, 455 So.2d 975 (Ala.Cr.App. 1983), aff'd,455 So.2d 984 (Ala. 1984), cert. denied, 469 U.S. 1132,105 S.Ct. 817, 83 L.Ed.2d 809 (1985). We also note that there was no co-defendant in the instant case. And, third, our independent weighing of the aggravating and mitigating circumstances in his case convinces us that the sentence of death is appropriate.
After hearing evidence during the sentencing-phase hearing concerning aggravating and mitigating circumstances; after being properly instructed by the trial court as to the applicable law; and after being correctly advised that if the mitigating circumstances outweighed the aggravating circumstances, the punishment would be life imprisonment without the benefit of parole, but that if the aggravating circumstances outweighed the mitigating circumstances, the punishment could be death; the jury returned a unanimous verdict fixing Nelson's punishment at death.
Thereafter, the trial court held another hearing to aid it in determining whether or not it would sentence appellant to death as recommended by the jury or to life imprisonment without the possibility of parole. In its findings of fact (see "Appendix" attached hereto and made a part of this opinion), the trial court found the existence of the following aggravating circumstances: Nelson was previously convicted of murder in the second degree, a felony involving the use or threat of violence to the person, in *Page 245 
the Circuit Court of Jefferson County, on August 28, 1974, said conviction being within twenty years preceding the commission of the offense giving rise to the instant case (this aggravating circumstance is encompassed within the capital offense alleged in the indictment), and the capital felony was committed while Nelson was engaged in the commission of the crime of robbery. §§ 13-11-2(a)(13); -6(2); and -6(4). The trial court found from the evidence that on January 1, 1978, Nelson intentionally, maliciously, and with premeditation shot and killed Thompson after having been convicted of a prior murder in the second degree on August 28, 1974. It further found from the evidence that the purpose of enticing Thompson to his trailer in Kimberly was to obtain his automobile and other personal property for the purpose of leaving the state after killing Cash some five hours earlier. The trial court examined the evidence for mitigating circumstances, and particularly examined it in the light of the mitigating circumstances set out in § 13-11-7, and found that no mitigating circumstances existed.
Thus, the trial court found the existence of two aggravating circumstances and no mitigating circumstances. It considered the aggravating circumstances, while noting the absence of mitigating circumstances, and, finding the aggravating circumstances sufficient to support the sentence of death recommended by the jury, sentenced Nelson to death.
We find that the findings and conclusions of the trial court are amply supported by the evidence in this case. There is no question as to the proof of the prior conviction of murder. The prior conviction was not in issue at the trial and was admitted. The evidence strongly supports the conclusion reached by the trial court that the present crime was committed while Nelson was engaged in the commission of the crime of robbery. We concur in the findings of the jury and the trial court that death is the appropriate sentence in this case. If one believes the testimony of Vice, as the jury obviously did, Nelson executed Thompson in a cold and calculated manner. Furthermore, the natural inference to be drawn from the evidence as a whole is that Nelson killed Thompson in order to obtain his automobile to flee and, thus, avoid detection and prosecution for his crime. Among the evidence overwhelmingly tending to support Vice's testimony, the location of Vice's leg wound, blood and a lady's earring on the floor beside the bed, the scalp wound on Thompson's head, and type A blood found on Nelson's clothing strongly corroborate her testimony.
Notwithstanding the fact that the crime occurred before July 1, 1981, the effective date of the 1981 Act, we choose to also review appellant's sentence by the provisions of § 13A-5-53, Code of Alabama 1975. Our findings above fully comply with §13A-5-53(a). In compliance with § 13A-5-53(b), we find the following: (1) There is no evidence that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) based on our independent weighing of the aggravating and mitigating circumstances, the sentence of death is appropriate in this case; and (3) considering the crime committed and the defendant, the death sentence is neither excessive nor disproportionate to the penalty imposed in similar cases.
We have carefully searched the record in both the guilt and sentence phases of Nelson's trial, and we have found no error. It is our opinion that appellant received a fair trial. Accordingly, appellant's conviction and sentence of death are due to be, and they are hereby, affirmed.
AFFIRMED.
All Judges concur.
 APPENDIX JUDGMENT AND SENTENCING ENTRY Indictment for Murder After Conviction of Murder Honorable Charles R. Crowder, Judge Presiding Case No. 78-01115
This the 15th day of March, 1982, came Earl C. Morgan, District Attorney, who *Page 246 
prosecutes for the State of Alabama, and also came the defendant in his own proper person and by attorney, William Dawson, and the defendant having been duly arraigned upon the indictment in this cause, and having entered his plea of not guilty, there came a jury of good and lawful persons, to-wit: Billy L. Smith and eleven others, who being duly empaneled and sworn according to Law, before whom the trial of this case was entered upon and continued from day to day and time to time, said defendant being in open Court at each and every stage and during all the proceedings in this cause. This the 18th day of March, 1982, said jurors upon their oaths do say, "We, the Jury, find the defendant, David Larry Nelson, guilty of the capital offense of murder in the first degree, after having been previously convicted of murder in the second degree within 20 years of said crime, as charged in the indictment." This the 18th day of March, 1982, said jurors upon their oaths do say, "We, the Jury, fix the punishment of the defendant, David Larry Nelson, at death."
This the 18th day of March, 1982, it is ordered by the Court that formal sentencing hearing be and the same is set for April 2, 1982 at 9:30 A.M.
This the 2nd day of April, 1982, came Earl C. Morgan, District Attorney, who prosecutes for the State of Alabama, and also came the defendant in his own proper person and by attorney, Honorable William Dawson, and in accordance with the law, the Court held formal sentencing this date to determine whether or not the verdict of the jury recommending death in the electric chair is to be upheld or the defendant be sentenced to life imprisonment without parole. Under Section 13-11-1 et seq. 1975 Code of Alabama, and further under the procedure outlined in Beck v. State, 396 So.2d 645, this Court is under an obligation to make findings determining mitigating and aggravating circumstances. The trial in this case was completed on March 18, 1982, and there as a jury verdict of guilty recommending punishment at death. The testimony and evidence at the trial are still fresh in the mind of this Court and the Court is cognizant of the exhibits and testimony offered at trial. The Court finds from the evidence that on January 1, 1978, that the defendant intentionally, maliciously and with premeditation and deliberation shot and killed Wilson W. Thompson after having been convicted of murder in the second degree on, to-wit: August 28, 1974. The Court further finds from evidence introduced at the trial that the purpose of enticing Mr. Thompson to a trailer park in Kimberly, Alabama, on the date in questions was in fact to obtain his automobile and other personal property for the purpose of leaving the State; the defendant having shot and killed J.D. Cash some five hours earlier. The Court finds that the defendant intentionally fired a shot into Mr. Thompson's head while the defendant was at said trailer court in Kimberly, Alabama, on January 1, 1978.
The Court finds the following aggravating circumstances to be present: 13-11-6(2). The defendant was previously convicted of another capital felony or felony involving the use or threat of violence to the person, to-wit: murder in the second degree, Circuit Court of Jefferson County on August 28, 1974. And 13-11-6(4). The capital felony was committed while the defendant was engaged or was an accomplice in the commission or an attempt to commit the crime of robbery. In conjunction with this subsection the Court finds that the purpose for the violence upon Mr. Thompson's person was to obtain his property, more specifically his automobile, with the intent to permanently deprive Mr. Thompson of that automobile and permanently convert it to his own use; and as evidence of this fact the Court finds that the defendant was arrested in Jasper, Tennessee, on January 2, 1978, in possession of Mr. Thompson's car and other items of personal property of Mr. Thompson. The Court finds no other aggravating circumstances to be present. The Court, after consideration of the mitigating circumstances enumerated in Section 13-11-7 1975 Code of Alabama and other mitigating circumstances, finds no mitigating circumstances to be present. After considering all the circumstances in this case the Court finds the *Page 247 
aggravating circumstances above enumerated to be present and said aggravating circumstances outweighing the mitigating circumstances. The Court finds no reason whatsoever to change the punishment as fixed by the jury. I, therefore, sentence the defendant, David Larry Nelson, to suffer death by electrocution on the 2nd day of July, 1982, and the Sheriff of Jefferson County, Alabama, is directed to deliver the defendant, the said David Larry Nelson, to the custody of the Director of the Department of Corrections and Institutions at Montgomery, Alabama, and the designated executioner shall, at the proper place for the execution of one sentenced to suffer death by electrocution, cause a current of electricity of sufficient intensity to cause death and the application and continuance of such current to pass through the body of the said David Larry Nelson until said David Larry Nelson is dead.
It is further considered by the Court that the State of Alabama have and recover of the said defendant the cost in this behalf expended, including the costs of feeding the defendant while in jail.
This the 2nd day of April, 1982, automatic appeal is hereby taken in this cause.
The Court finds the defendant is indigent, it is ordered by the Court that the Honorable William Dawson be and he is hereby appointed to represent the defendant on the appeal in this cause.
It is further ordered by the Court that the defendant be provided with a free transcript of the record herein.
 FINDINGS OF FACTS
In accordance with the law, the Court held a hearing on April 2, 1982, to determine whether or not the verdict of the jury recommending death in the electric chair is to be upheld or the defendant be sentenced to life imprisonment without parole. The defendant was present in open court with his attorney, Honorable William Dawson.
Under Section 13-11-1 et seq. 1975 Code of Alabama, and further under the procedure outlined in Beck v. State,396 So.2d 645, this Court is under an obligation to make findings determining mitigating and aggravating circumstances. The trial in this case was completed on March 18, 1982, and there was a jury verdict of guilty recommending punishment at death. The testimony and evidence at the trial are still fresh in the mind of this Court and the Court is cognizant of the exhibits and testimony offered and entered at trial.
The Court finds from the evidence that on January 1, 1978, that the defendant intentionally, maliciously and with premeditation and deliberation shot and killed Wilson W. Thompson after having been convicted of murder in the second degree on, to-wit, August 28, 1974. The Court further finds from evidence introduced at the trial that the purpose of enticing Mr. Thompson to a trailer park in Kimberly, Alabama, on the date in question was in fact to obtain his automobile and other personal property for the purpose of leaving the state; the defendant having shot and killed J.D. Cash some five hours earlier. The Court finds that the defendant intentionally fired a shot into Mr. Thompson's head while the defendant was at said trailer court in Kimberly, Alabama, on January 1, 1978.
The Court finds the following aggravating circumstances to be present:
13-11-6(2). The defendant was previously convicted of another capital felony or felony involving the use or threat of violence to the person; to-wit, murder in the second degree, Circuit Court of Jefferson County on August 28, 1974.
And 13-11-6(4). The capital felony was committed while the defendant was engaged or was an accomplice in the commission or an attempt to commit the crime of robbery. In conjunction with this subsection the Court finds that the purpose for the violence upon Mr. Thompson's person was to obtain his property, more specifically his automobile, with the intent to permanently deprive Mr. Thompson of that automobile and permanently convert it to his own use; and as evidence of this fact the Court finds that the defendant was arrested in Jasper, Tennessee, on January 2, 1978, in possession of Mr. Thompson's car and other items of personal property of Mr. Thompson.
The Court finds no other aggravating circumstances to be present. *Page 248 
The Court, after consideration of the mitigating circumstances enumerated in Section 13-11-7 1975 Code of Alabama and other mitigating circumstances, finds no mitigating circumstances to be present.
After considering all the circumstances in this case the Court finds the aggravating circumstances above enumerated to be present and said aggravating circumstances outweighing the mitigating circumstances. The Court finds no reason whatsoever to change the punishment as fixed by the jury.
I, therefore, sentence the defendant, David Larry Nelson, to suffer death by electrocution on the 2nd day of July, 1982, and the Sheriff of Jefferson County, Alabama, is directed to deliber the defendant, the said David Larry Nelson, to the custody of the Director of the Department of Corrections and Institutions at Montgomery, Alabama, and the designated executioner shall, at the proper place for the execution of one sentenced to suffer death by electrocution, cause a current of electricity of sufficient intensity to cause death and the application and continuance of such current to pass through the body of the said David Larry Nelson until said David Larry Nelson is dead.
Dated this 2nd day of April, 1982.
 Charles R. Crowder Charles R. Crowder
Circuit Judge
[1] Nelson was first tried for the robbery of James Dewey Cash during which Cash was intentionally killed. He was convicted and sentenced to death. The Court of Criminal Appeals affirmed the conviction on February 26, 1980, but remanded the case to the trial court for proper sentencing. Nelson v. State,405 So.2d 392 (Ala.Cr.App. 1980). The Alabama Supreme Court granted certiorari and reversed and remanded the case to this court on authority of Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382,65 L.Ed.2d 392 (1980); Beck v. State, 396 So.2d 645 (Ala. 1980);Ritter v. State, 403 So.2d 154 (Ala. 1981); and Reed v.State, 407 So.2d 162 (Ala. 1981), on August 28, 1981. Nelson,405 So.2d 401 (Ala. 1981). We, accordingly, reversed and remanded the case to the trial court on October 6, 1981.Nelson, 405 So.2d 401 (Ala.Cr.App. 1981). Nelson was tried again and on November 27, 1982, found guilty of the robbery and murder of Cash. He was sentenced to life imprisonment in the penitentiary. On appeal, this second conviction was affirmed.Nelson, 452 So.2d 1367 (Ala.Cr.App.), cert. denied,452 So.2d 1367 (Ala. 1984). The facts and circumstances surrounding this crime are set out in detail in Nelson, 405 So.2d 392
(Ala.Cr.App. 1980).
[2] The 1975 capital punishment statute, as contained in §§ 13-11-1 through 13-11-9, was, upon adoption of the new criminal code, effective January 1, 1980, recodified in identical language as §§ 13A-5-30 through 13A-5-38. These sections of the new criminal code were repealed effective July 1, 1981, by the 1981 capital offense statute, which applies only to conduct occurring on or after July 1, 1981; the repeal of §§ 13A-5-30
through 13A-5-38 did not affect the applicability of those sections to conduct that occurred before July 1, 1981.